CONOCO INC., Plaintiff,

Amerada Hess Corporation, et al.,
Third–Party Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 92–331C.

United States Court of Federal Claims.

April 1, 1996.*

* The Opinion previously issued on March 14, 1996, is withdrawn and is substituted by the Opinion issued this date.

Harry M. Reasoner, Houston, TX, with whom was John D. Taurman, Washington, DC, for plaintiff.

E. Edward Bruce, Washington, DC, with whom were Stephen J. Rosenbaum and Adam M. Cole, for third-party plaintiffs.

Mark A. Melnick, Washington, DC, with whom were Nadira Clarke and John C. Erickson of the U.S. Department of Justice, for defendant.

## *OPINION*

ROBINSON, Judge:

This matter originally came before the court on defendant's motion for summary judgment, Conoco Inc.'s ("Conoco") cross-motion for partial summary judgment, and third-party plaintiffs' ("plaintiffs") cross-motion for partial summary judgment. Oral argument was held on January 31, 1995.

On June 23, 1995, and August 8, 9 and 10, 1995, the court entered judgment pursuant to the some of the parties' joint motions to dismiss and stipulations for compromise settlements, pursuant to which, the Florida and Alaska lease claims of Conoco and plaintiffs were settled. Moreover, the North Carolina claims of Shell Offshore Inc., Shell Frontier Oil & Gas Inc., Shell Western E & P Inc., OXY USA Inc., and Conoco have also been settled. After settlement of the issues presented with respect to various oil and gas leases in the Gulf of Mexico, Bristol Bay, Alaska, and some of the leases offshore North Carolina, this case now involves only the remaining oil and gas leases granted by various government contracts to the remaining plaintiffs involving the Outer Continental Shelf ("OCS") off the coast of North Carolina, which plaintiffs purchased in competitive sales at various times in the 1980s.

In 1992, Conoco filed suit in this court alleging that certain legislative actions of defendant materially breached the contracts at issue, frustrated performance thereof, rendered such performance impracticable, or constituted a taking in violation of the Fifth Amendment of the United States Constitution. Other oil and gas companies[1] holding

---

1. Amerada Hess Corporation, Amoco Production Co., Chevron USA Inc., Marathon Oil Company, Mobil Oil Corporation, Mobil Exploration and Producing Southeast Inc., Mobil Exploration and Producing U.S. Inc., Mobil Exploration and Producing North America Inc., Murphy Exploration & Production Company, Murphy Oil USA, Inc., Odeco Oil & Gas Company, OXY USA Inc., Pennzoil Exploration and Production Company, Shell Offshore Inc., Shell Frontier Oil & Gas Inc., Shell Western E & P Inc., Texaco Inc., Texaco Exploration and Production, Inc., Union Oil Company of California.

similarly affected leases were notified of their interests in the case pursuant to Rule 14(a)(1) and (b) of the Rules of the United States Court of Federal Claims ("RCFC"). As a result, nine of these oil companies filed suit on October 28, 1992 as third-party plaintiffs. These third-party plaintiffs included: Amerada Hess Corporation, Chevron USA Inc., Marathon Oil Company, Mobil Exploration & Producing U.S. Inc., Murphy Exploration & Production Company, Murphy Oil USA, Inc., OXY USA Inc., Pennzoil Exploration & Production Company, and Shell Offshore Inc.. Then, on October 28, 1995, eight more oil companies filed an RCFC 24 motion to intervene. The court granted their motion, and Amoco Production Company, Mobil Oil Corporation, Mobil Exploration & Producing North America Inc., Mobil Exploration & Producing Southeast Inc., Shell Frontier Oil & Gas Inc., Shell Western E & P Inc., Texaco Exploration and Production, Texaco Inc., and Union Oil Company of California were included in the case as intervenors.

In brief, plaintiffs' complaints seek damages for breach of contract, restitution for the money paid in bonuses and annual rental payments, or, alternatively, the fair market value of the taken property. However, as will be discussed later, plaintiffs' motions do not require a ruling upon the taking issue. Defendant denies that any breach, frustration, or circumvention of the lease contracts or taking of plaintiffs' rights granted under the leases has occurred. By its motion for summary judgment, defendant seeks a ruling in its favor on all counts in plaintiffs' complaints. According to defendant, all of the government's actions were fully authorized by the lease agreements and, in any event, such actions, because of their broad public nature, have not given rise to any rights to recover compensation in damages for breach or restitution because they are shielded by the sovereign acts and unmistakability doctrines. Plaintiffs have moved for partial summary judgment on the breach of contract and restitution issues. For the reasons set forth below, plaintiffs' cross-motion for partial summary judgment is granted. With respect to defendant's motion for summary judgment on the taking issue, the court concludes that there is neither need nor sufficient evidence to resolve that issue in this opinion.

## *BACKGROUND*

The OCS is the submerged land beneath navigable waters on the Continental Shelf beginning seaward of the coastal waters within the jurisdiction of the individual states. 43 U.S.C. §§ 1301(a), (b), 1331(a). Coastal states assert jurisdiction over the waters and submerged lands within three miles of their coasts; the OCS extends from these boundary lines outward. *Id.* The federal government asserts jurisdiction over the OCS and the mineral resources found there via the Outer Continental Shelf Lands Act ("OCSLA" or "the Act"), 43 U.S.C. § 1331 *et seq.*[2]

2. The OCSLA was passed in 1953 in order to establish the federal government's exclusive jurisdiction over the OCS and to foster the exploitation of the OCS's resources. Over the past forty-two years, over one hundred oil and gas lease sales have been conducted under the OCSLA and successful bidders have paid over $55 billion to the United States Treasury for the right to explore, develop and produce minerals under such leases. In 1978, Congress, in light of the country's pressing energy needs, overhauled the OCSLA and adopted a new statutory regime designed to serve a new declaration of national policy, one permitting "expeditious and orderly development subject . to environmental safeguards ..." 43 U.S.C. § 1332(3) (1988). However, the 1978 amendments also established detailed procedures and criteria for the Secretary of the Interior to follow in exercising his authority to grant leases. In sum, the OCSLA provided for the expeditious and orderly development of the OCS subject to environmental safeguards under a 4–phase framework: (1) preparation of a 5–year leasing plan; (2) lease sales; (3) lease exploration; and (4) lease development and production. Also, the Secretary was granted carefully limited authority to cancel a lease upon finding that the threat of "environmental harm" outweighed the advantage of continuing activity on the lease. Because Congress recognized that "environmental" cancellations would not be the fault of the lessees, Congress supplemented the lessee's other remedies for such cancellations with a statutory compensation formula. 43 U.S.C. §§ 1334(a), 1351(e). This 1978 legislation recognized that the "basic purpose" of the new regime was to promote the swift, orderly and efficient exploitation of the country's untapped domestic oil and gas resources in the OCS.

## I. *Lease Acquisition*

The OCSLA authorizes the Secretary of the Interior ("SOI" or "Secretary") to sell leases to explore for oil and gas within the OCS through a competitive bidding system. 43 U.S.C. § 1337. The sale of OCS leases is a complicated multi-step process involving defined actions by the Secretary and other state and federal agencies. Among other things, the Secretary must formulate a five-year oil and gas leasing program that sets forth a schedule of proposed lease sales and indicates the size, timing, and location of leasing activity and reflecting, to the maximum extent possible, "a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone." 43 U.S.C. § 1344(a). Prior to a lease sale, the Secretary must publish in the *Federal Register* a call for information regarding industry interest and environmental concerns relating to the proposed sale. 43 U.S.C. § 1344(c), (f). At least six months prior to a lease sale, the Secretary must study the sale's potential environmental impacts and issue a draft environmental impact statement ("EIS") regarding the lease sale followed by a period of hearings and comments leading to the approval of a final EIS. 43 U.S.C. § 1346(a). Next, the Secretary must make a preliminary decision about whether to proceed with the sale, based on information and options collected in a Secretarial Issue Document. If the decision is to proceed, the Secretary must publish a proposed Notice of Sale in the *Federal Register*. Thereafter, the Secretary must formally consult with the governors of affected states concerning the proposed Notice of Sale. If the Secretary decides to go forward with the sale, he must decide on how to conduct the lease sale and publish a final Notice of Sale, identifying the blocks available for leasing and the bidding system to be used. 43 U.S.C. § 1337(a)(8). After a waiting period of at least thirty days after the invitation for bids ("IFB") has been issued, the Secretary receives sealed competitive bids on the ap-pointed day of sale and reviews them to determine the leases to be issued. Finally, a lease may be issued to each of the successful bidders. The Department of the Interior ("DOI") then issues OCS leases on standard, non-negotiable lease forms prepared by the DOI. Under the leases, the United States of America is the "Lessor." The "leased area" is generally a three-square mile tract. The terms of the leases usually are for five or ten years, but the terms are extendable so long as drilling or production is taking place on a leased tract. All OCS lessees must pay large cash bonuses as well as periodic lease payments for the potentially petrolific tracts they acquire. 43 U.S.C. § 1337.

In August 1981, August 1982, and September 1983, the government conducted lease Sale Nos. 56, 78 and RS–2 for fifty-three tracts off the coast of North Carolina (the "North Carolina leases"). Some of the tracts included in these sales, including several in the "Manteo" area of the OCS, were in deep water; technological and safety concerns had been voiced about leasing in that area. Plaintiffs[3], or their predecessors in interest, paid a total of $354,658,363.80 in bonuses for the North Carolina leases and a total of $8,557,447.38 in annual rentals. *Parties' Stipulations at 77–83.* Of this amount, Conoco claimed that it paid $20,974,916 to purchase interests in nineteen leases offshore North Carolina and for the opportunity to explore oil and gas deposits, while third-party plaintiffs claim that they paid the government $341 million in bonuses and rentals for the leases. These leases are not adjacent to areas where production is already occurring. Accordingly, exploration of the tracts is an essential first step to determination of whether the leases have any ultimate value.

Under the OCSLA's statutory scheme, after acquiring these OCS leases, a lessee had to obtain not only the DOI's approval but also that of any involved state and federal agencies before taking any further action

---

3. These plaintiffs originally included: Conoco Inc., Amerada Hess Corporation, Amoco Production Company, Chevron USA Inc., Marathon Oil Company, Mobil Exploration and Producing Southeast Inc., Murphy Exploration & Production Company, OXY USA Inc., Shell Offshore Inc., and Union Oil Company of California.

under the leases.[4] After the Secretary's approval of a plan of exploration ("POE") and completion of successful exploration operations, but prior to any oil and gas development and production pursuant to an OCS lease, a lessee must next submit a development and production plan to the Secretary for approval. 43 U.S.C. § 1351(a)(1). The production plan must include a description of the type and location of facilities and operations to be used, "the land, labor, material, and energy requirements associated with such facilities and operations" and the environmental and safety safeguards to be used. 43 U.S.C. § 1351(a)(2). Plans must also include specific work to be performed. 43 U.S.C. § 1351(c). Before a development plan may be approved and a permit granted, the state must concur with the plan under the CZMA or the Secretary must make the appropriate findings under that act. 43 U.S.C. § 1351(d). Finally, the Secretary must issue a final EIS pursuant to the National Environmental Policy Act of 1969 ("NEPA"). If the lessee's development plan fails to provide adequate environmental safeguards, the Secretary must require modification to ensure compliance.

## II. *Lease Terms*

The critical terms of the leases at issue are substantively identical. *See Parties' Stipulations* § 124 *et seq.*, at 55ff. The leases were entered into by and between the United States as lessor and plaintiffs as lessees. The lease agreements set forth the terms of the contracts as well as the rights and privileges conferred on the lessees. First and perhaps most importantly, the lease contracts provide:

Sec. 1. *Statutes and Regulations.* This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. [§] 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act"). The lease is issued subject to the Act; [Sections 302 and 303 of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. [§§] 7152 and 7153;] all regulations issued pursuant to the statute and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

*See* Stipulated Exhibits ("SXs") 128–180, Sec. 1.

Sec. 2. *Rights of Lessee.* The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately ... acres or ... hectares....

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's

---

**4.** Prior to commencing actual exploration activity pursuant to a lease, each lessee had to submit for approval by the Secretary a plan of exploration ("POE"), containing a schedule of anticipated exploration activities, a description of the equipment to be used, the location of each well to be drilled, and other pertinent information. 43 U.S.C. § 1340(c)(1), (3). The Secretary is required to approve the plan within thirty days if the requirements of the OCSLA and the regulations prescribed thereunder are met. However, if the Secretary determines that the proposed activity would likely cause serious harm or damage to life, property, mineral deposits, the national security or defense, or the marine, coastal or human environment, and the proposed activity cannot be modified to avoid such harm, the Secretary may not approve the plan. 43 U.S.C. § 1340(c)(1). The state's approval under the Coastal Zone Management Act of 1972 ("CZMA") may also be required, 43 U.S.C. § 1340(c)(2), and no exploration under the leases may commence until the exploration plan is fully approved.

delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

*See Id.*, Sec. 2.

In regard to performance, Sec. 10 of the leases contain a provision requiring that the lessees comply with all regulations and orders relating to exploration, development and production. The lease terms also contain a provision in Sec. 13 stating, "The Lessor may suspend or cancel this lease pursuant to Section 5 of the [OCSLA] and compensation shall be paid when provided by the Act." Section 5 of the OCSLA does not discuss lease suspensions.

III. *Post-lease Legislative Actions*

The owners of twenty-one of the North Carolina leases combined their leases into a single unit, the Manteo Unit, and proposed to drill one exploratory well about forty-five miles east of Cape Hatteras. The State of North Carolina expressed strong objections to the proposed well. In July 1989, a Memorandum of Understanding ("MOU") was reached among the State of North Carolina, the DOI, and the operator of the Manteo unit (a subsidiary of Mobil Oil Corporation), which provided for a special environmental review before the DOI could act on the Manteo Unit's POE.

In August 1990, as a result of enhanced environmental concerns and the successful legislative efforts of Congressman Walter Jones of North Carolina, Congress enacted the Outer Banks Protection Act ("OBPA") as part of a more comprehensive oil spill legisla-

tion package, which came immediately prior to Mobil's submission to the Secretary of a POE for the single Manteo Unit exploratory well. A month after the passage of the OBPA, in September 1990, the DOI announced that this POE would have been approved if not for the prohibitions contained in the OBPA. The OBPA directly impacted the OCSLA and profoundly affected plaintiffs' North Carolina leases. Without amending the OCSLA, the OBPA expressly prohibited the DOI from approving any POEs or otherwise permitting exploration, production, or development of the OCS offshore North Carolina until at least October 1, 1991. Thereafter, such activity was to be permitted only after the Secretary certified to Congress that he has "sufficient" information to carry out his responsibilities under the OCSLA in approving a submitted POE and then the Secretary was required to wait at least "45 days" of continuous Congressional session to pass before approval could occur.[5]

The OBPA also provides that before the Secretary may make a certification to Congress, an Environmental Sciences Review Panel ("ESRP") must be convened to make findings and recommendations regarding the adequacy of available environmental data, including oceanographic, ecological, and sociological data, to make decisions regarding the exploration and development of the OCS offshore North Carolina. If the Secretary's certification differs from the ESRP's findings and recommendations, the certification must provide a detailed justification for the differences. Only after these steps have been taken may the Secretary approve a POE on behalf of the DOI. Moreover, even if a lessee is able to obtain the Secretary's approval of a POE, these same restrictive procedures then must be followed in order to obtain approval of a plan of development.

---

5. With respect to this embargo prior to October 1, 1991, the OBPA provides:

(c) Prohibition of oil and gas leasing, exploration, and development

(1) Prohibition

The Secretary of the Interior *shall not*—

(A) conduct a lease sale;

(B) issue any new leases;

(C) approve any exploration plan;

(D) approve any development and production plan;

(E) approve any application for permit to drill; or

(F) permit any drilling,

for oil or gas under the Outer Continental Shelf Lands Act [] on any lands of the Outer Continental Shelf offshore North Carolina.

33 U.S.C. § 2753(c)(1) (emphasis added).

The report of the ESRP was not submitted until January, 1992. As of February 15, 1994, studies regarding the Manteo Unit well were still being reviewed. Approval of drilling of this single exploratory well was delayed by the OBPA from its August 1990 effective date until early 1994. All operations under plaintiffs' North Carolina leases are currently suspended, in some cases since as early as October 1988. In each instance, the lease terms have been concomitantly extended and the rental payments suspended.

## CONTENTIONS OF THE PARTIES

### I. Plaintiffs' Contentions

Plaintiffs complain that after paying large sums of money to acquire these leases, the enactment and enforcement of subsequent legislation, the OBPA, materially breached binding contracts, the leases, into which the United States, as a party, had entered into with them and, further, that such legislation has not only made it impossible for them to take advantage of their leases but also has interfered with the Secretary's ability to perform his contractual duties. Plaintiffs contend that because of such material breaches by defendant, including the Secretary's failure to timely consider plaintiffs' POEs under the OCSLA, which the OBPA did not expressly repeal, defendant is liable to plaintiffs for damages. In this regard plaintiffs contend that although the DOI's standard lease forms do not explicitly state the lessor's obligations regarding approval of submitted POEs, in light of the express terms of the leases and the circumstances of their sale, the lessor nevertheless is contractually bound to fairly consider and expeditiously act upon the lessees' POEs as well as any subsequent development and production plans that might follow. Otherwise, the bargain between the lessor and lessees would be illusory and would permit defendant's unilateral forfeiture of plaintiffs' lease bonuses with impunity. They argue forcefully that this is particularly true here because the government drafted the lease terms which were not subject to negotiation. Accordingly, plaintiffs seek restitution of the money they have paid to defendant in bonuses and annual rentals. Plaintiffs do not claim that defendant's failure to approve plaintiffs' POEs and grant the necessary permits breached their lease contracts, but only that defendant's failure at least to fairly consider their plans was a material breach.

Plaintiffs argue that even if the enactment of the OBPA is viewed only as a delay in exploration, defendant still has materially breached the leases. According to plaintiffs, there is a duty of good faith implied in every contract that neither party to a contract will do anything to prevent, hinder, or delay performance of the other party to that contract. Moreover, plaintiffs say that the contracts for the exploration or production of oil and gas contain covenants that the lessor will not delay development of the leased tracts. But, in contravention of such covenants, plaintiffs maintain that defendant has deliberately prevented them from receiving any benefits from their leases for years, and that such delay, which continues to this day, constitutes a material contract breach.

In the alternative, plaintiffs also contend that the OBPA has frustrated their performance of the leases, thereby entitling them to restitution. Plaintiffs say that a party's duty to perform under a contract may be discharged where an unexpected contingency occurs, the risk of which was not allocated to either party, and which renders performance impracticable. Since the principal purpose of the leases has been frustrated, plaintiffs argue that their lease contracts should be deemed a nullity.

In sum, plaintiffs argue that by virtue of the terms of the leases, defendant was contractually obligated at least to fairly consider plaintiffs' POEs within a reasonable time after their submission and that, because of passage of the OBPA, when the DOI was divested of its power to properly and timely consider plaintiffs' POEs and either approve or disapprove them based upon their respective merits, defendant was in breach. Plaintiffs contend that not one of the defenses defendant has interposed, including the sovereign acts and unmistakability doctrines, has merit. Accordingly, plaintiffs seek a finding of a breach of their lease contracts and a judgment awarding damages. Alternatively, plaintiffs seek contract rescission

and restitution of all payments made to the government.

## II. *Defendant's Contentions*

### A. Lease Rights and Expectancies

Defendant contends that the OCS leases do not grant plaintiffs an absolute right to explore or develop the areas subject to their leases. It argues that the sale of a lease is a distinct stage of the OCS administrative process, separate from the issuance of a federal permit to explore or develop. In other words, defendant claims that plaintiffs purchased the leases knowing full well that they might never be able to exploit them. According to defendant "an OCS lease only grants its holder a priority over others to subsequently submit [sic] for federal approval plans for exploration, production, or development." Nothing in the leases, says defendant, guarantees the lessees that any of permits will ultimately be granted.

Since the leases unequivocally state they are subject to the OCSLA, its regulations, and all other applicable statutes and regulations, defendant argues that plaintiffs had notice that the OCSLA establishes many requirements which have to be met before a permit for exploration can be granted. Defendant points out that plaintiffs were aware that the environmental impacts of their proposed activities had to be carefully studied and that their permits could be denied. Moreover, defendant says that even with approved POEs, lessees must then apply for permits to drill, which also require vast amounts of technical data, compliance with other acts, regulations and state and other environmental laws.

Defendant denies that it has breached any of the lease contracts or taken any property interest of plaintiffs and moves for summary judgment on all counts, including whether there has been a taking of plaintiffs' property interest in the North Carolina leases. Defendant essentially argues that plaintiffs' defined rights and expectancies as set forth in the lease agreements were extremely limited and that all actions taken by the government, i.e., enacting the OBPA and suspending the leases, were all contemplated by the lease agreements themselves. According to defendant, it has not breached the lease agreements because it has only suspended the leases and the regulations incorporated into the leases permit lease suspensions.

### B. The effect of the OBPA suspensions

Defendant argues that the OBPA suspensions neither breach nor frustrate the purpose of the lease contracts. In this regard, defendant states that only three POEs were ever submitted for DOI approval by certain of the plaintiffs holding North Carolina leases.[6] Thus, defendant argues that the OBPA did not bar exploration and development from ever occurring, but only imposed certain additional requirements on the DOI before it could approve a drilling permit. Further, defendant argues that plaintiffs have suffered no material harm due to the suspension of the North Carolina leases and the delayed CZMA review process for the Manteo Unit, because even if there were no OBPA, the status of plaintiffs' POEs would be no different than they presently are. According to defendant, plaintiffs cannot recover damages due to a delay unless that delay is solely attributable to defendant's unauthorized, improper acts which, according to defendant, have not occurred. Defendant argues the delay in implementing the pending POE for the Manteo Unit has actually been caused by plaintiffs' own inability to obtain CZMA concurrence from North Carolina. Defendant contends that suspension of the North Carolina leases is consistent with the terms of the leases. It says that the OBPA states that if insufficient information exists regarding the impact of oil and gas operations on the North Carolina OCS, the DOI must engage in further environmental review. Additionally, defendant argues that the OBPA is contemplated under the leases because it is "an applicable statute" as described in the leases here at issue.

---

**6.** Third-party plaintiff Chevron submitted and subsequently received DOI approval of its POE but never took further steps to explore its tract. Arco Exploration Company also received DOI approval of its POE along with North Carolina's concurrence but never actually explored its tract either.

■ Defendant argues that, in any event, the sovereign acts and unmistakability doctrines shield the government from liability.[7] Finally, defendant argues that plaintiffs did not possess any expectancies that could be taken and, even if they did, the government's actions with respect to the North Carolina leases fall short of a taking in violation of the Fifth Amendment.

In sum, Defendant counters that plaintiffs' rights and expectancies as defined by the lease agreements were extremely limited, that all actions taken by defendant, i.e., suspending the leases, were contemplated by or specifically allowed by the plain meaning of the lease contracts, that the OBPA's added restrictions and the extent that plaintiffs' rights were limited thereby were shielded by the sovereign acts and unmistakability doctrines and that no taking has occurred in violation of the Fifth Amendment by virtue of passage of the OBPA.

## DISCUSSION

■ Summary judgment pursuant to RCFC 56(c) is the appropriate means for disposing of a case or issue in which the movant or cross-movant is entitled to judgment as a matter of law and there are no genuine issues of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The standard for whether there is a material issue of disputed fact is whether a reasonable finder of fact could return a verdict in favor of the non-movant. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir. 1987). In determining entitlement to summary judgment, the court may look beyond the pleadings to determine in which party's favor the questions of law will be resolved and whether any apparent issues of fact are merely illusory.

## I. *Contract Interpretation*

### A. Generally

■ Breach of contract is the central issue presented by the parties' respective motions for (partial) summary judgment. In order to decide this issue, as a threshold matter, it is necessary to ascertain the exact meaning of the contract terms, which define the parties' rights, liabilities, and responsibilities. Thus, in this case, contract interpretation necessarily precedes breach analysis. The purpose of contract interpretation is to crystalize the parties' objectively manifested intent, and this may involve interpretation of specific language or terms, explanation of ambiguities, risk allocation, and sometimes the consideration of extrinsic evidence for limited purposes. As stated by the Federal Circuit recently, the "principal objective in deciding what contractual language means is to discern the parties' intent *at the time the contract was signed.*" *Winstar Corp. v. United States*, 64 F.3d 1531, 1540 (Fed.Cir. 1995) (emphasis added). Contract interpretation, a question of law properly disposed of on summary judgment, *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984), may be inextricably intertwined with underlying questions of material fact. *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir.1988). Although the Federal Circuit normally reviews this court's factual determinations for clear error and contract interpretations based thereon de novo, *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed.Cir. 1993), summary judgment may only be granted on those issues presenting no questions of material fact. The process of deciding a motion for summary judgment involving issues of contract interpretation seldom lends itself to a linear analysis.

Courts and boards follow no predetermined, well-defined analytical framework when giving a contract meaning through the interpretive process. One cardinal

---

7. The sovereign acts doctrine shields the United States from liability for a breach of contract when federal legislative or executive actions interfere with a governmental contract when the interfering governmental action is "public and general." The unmistakability doctrine, which is closely tied to the sovereign acts doctrine, says that the government contractually waives neither its sovereign immunity nor its sovereign power to legislate, regulate, or tax unless that power is surrendered in "unmistakable terms."

rule, however, is to seek to ascertain a single interpretation of the contract that reflects the parties' intent. This is generally done by using an objective standard to give a contract its legally enforceable meaning.... This process of interpretation is fluid rather than rigid.... If a 'clear' interpretation is found, analysis ends; otherwise, a circuitous evaluation of the other factors may ensue.

JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 143–44 (3d ed. 1995).

### B. Interpretation of the North Carolina Lease Contracts

Before determining whether defendant has breached certain terms of plaintiffs' lease contracts, the court must first attempt to ascertain the exact meaning of the relevant lease terms. If these terms are clear and unambiguous, the court's process of interpretation in order to identify the objectively manifested intent of the parties is less arduous. If, however, the relevant terms are ambiguous, then contract interpretation becomes more complex and the court must use various interpretative tools, which allow the court to carve a path through the thorny entanglements of contract language. *See* CIBINIC & NASH, ADMINISTRATION 143–44 (3d ed. 1995).

### 1. Objectively Manifested Intent & Plain Meaning

 Although the federal government's procurement procedures are carefully governed by statute and regulation, the formation and administration of government contracts are, for the most part, consonant with the principles of common law contracts. *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 411, 68 S.Ct. 123, 124–26, 92 L.Ed. 32 (1947) (citing *United States v. Standard Rice Co.,* 323 U.S. 106, 111, 65 S.Ct. 145, 147, 89 L.Ed. 104 (1944)). To the extent that the Uniform Commercial Code ("U.C.C.") is not inconsistent with federal law, it is also commonly used to provide guidance in determining the rights and liabilities of the parties to a public contract. *See* JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS 151 (2d ed. 1986). While

Title 41 of the United States Code ("U.S.C.") and Title 48 of the Code of Federal Regulations ("C.F.R.") set forth special procedures and standards unique to contracts involving the government and a private contractor, the vast body of contract law contains universal principles applicable to all contracts, including those covered by the U.S.C. and C.F.R. Such principles provide invaluable guidance in contract interpretation. Contract interpretation is the process through which the objectively manifested intent of the parties as to what exactly they bargained for is determined. RESTATEMENT (SECOND) OF CONTRACTS §§ 200, 201 (1981). Contract interpretation constitutes an objective test; the standard is what a similarly situated reasonably prudent contractor would have understood the contract language to mean, not what the drafter or any other party subjectively intended the contract to mean. *City of Oxnard v. United States,* 851 F.2d 344, 347 (Fed.Cir.1988); *Badgley v. United States,* 31 Fed.Cl. 508, 511 (1994). If the intent of the parties can be discerned from the contract language as a whole and the parties' underlying purposes for entering into the contract, this interpretation will control. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 201, 202 (1981).

 The intent of the parties to the leases here at issue may be readily ascertained from the language of Sec. 1 and a careful reading of the contracts as a whole. Such an analysis suggests a plain meaning interpretation. The clause referring to "all other applicable statutes and regulations" makes no mention of future or subsequent legislation which might affect the lessees' rights and the procedures for submission of POEs. Within that same section, however, the drafters *were* explicit when they intended to call attention to future or subsequent action. For example, with respect to the applicable regulations, the drafters explained that they meant those regulations "issued pursuant to the statute and *in existence upon the Effective Date* of this lease" and "regulations issued pursuant to the statute *in the future."* Unquestionably, the drafters knew how to specify, and thereby expressly put the lessees on notice of, future or subsequent legislation because they did exactly that in con-

nection with future regulations. In other words, the lessor, the government, in its use of the diction it selected in these leases, knew exactly what they wanted to encompass and what they wanted to omit. This supports application of the well-recognized maxim of legal interpretation, *expressio unius est exclusio alterius*, the expression of one thing is the exclusion of another. "Where certain things are specified in detail in a contract, other [terms] of the same general character relating to the same matter are generally held to be excluded by implication." *Nicholson v. United States*, 29 Fed.Cl. 180, 196 (1993) (citing GROVER C. GRISMORE, PRINCIPLES OF THE LAW OF CONTRACTS § 105, at 164 (1947)); *United Pac. Ins. Co. v. United States*, 204 Ct.Cl. 686, 692, 497 F.2d 1402, 1405 (1974). It is a "well accepted and basic principle [of contract interpretation]" that, wherever possible, contracts must be interpreted to give reasonable meaning to all provisions of the contract; such an interpretation is always preferable to one which collapses parts of the contract into meaningless or superfluous redundancy. *Fortec Constr. v. United States*, 760 F.2d 1288, 1292 (Fed. Cir.1985); *Reliable Bldg. Maint. Co. v. United States*, 31 Fed.Cl. 641, 643 (1994); *Sharpe Refrigeration, Inc. v. United States*, 30 Fed. Cl. 735, 738 (1994). To hold that application of the OBPA was within the objectively manifested intent of the parties to the North Carolina leases, as defendant suggests, would mean that the provisions in Sec. 1 should be read to include not only all future or subsequent regulations but also statutes. This would render the labored language, *"in existence upon the Effective Date of this lease"* and "issued pursuant to the statute *in the future*," unnecessary, ineffective, and confusing. This is precisely the result courts strive to avoid, and in this case, there is neither need nor justification to endorse this interpretation. Indeed, to read this language, as defendant would have the court do, injects ambiguity and confusion where none would otherwise exist.

Moreover, defendant's argument that the leases may be interpreted to include future or subsequent statutes and their related regulations is inconsistent with the underlying purpose of these lease contracts, which was to promote the discovery of new hydrocarbon resources. This underlying purpose provides further support for the interpretation that the parties' agreements covered only *existing* statutes and related present and future regulations specifically promulgated pursuant to the OCSLA for administering oil and gas exploration. Plaintiffs entered into these oil and gas leases, which are not materially different from many similar leases that had previously been entered into with many oil companies for the opportunity to explore and develop the petroleum resources of the OCS both offshore North Carolina and in other areas. The court's reading of the language of these leases indicates that at the time such leases were executed, none of the parties to these leases anticipated or envisioned the enactment of the OBPA or any similar legislation approximately nine years later.[8] In the early '80s, neither the government nor plaintiffs had any inkling that the OBPA would be enacted. The facts show that only after passage of the OBPA did defendant broaden its interpretation of the scope of the lease agreements' conditions. Contract terms should be interpreted *without* "regard either to the probable intention of the parties contracting, or to the probable changes which they would [have] made in their contract, had they foreseen certain contingencies." WILLIAM W. STORY, A TREATISE ON THE LAW OF CONTRACTS § 639, at 562 (2d ed. 1847).

Defendant's position, that under OCSLA plaintiffs paid consideration for the mere possibility of exploiting limited and uncertain contractual rights is technically correct. Unquestionably, the Secretary, based upon a legitimate and factually supported finding of harm to the environment—i.e., a fair exercise of discretion—may disapprove POEs. However, the lease contracts here at issue cannot

---

8. Plaintiffs' contention that because the leases were defectively formed, i.e., with no meeting of the minds, the parties never reached a binding agreement is not persuasive. This contention is essentially a non-issue in this case because the undisputed evidence shows that each of the parties reached an explicit agreement with the government and that there was mutual assent as to the scope of their respective rights and liabilities.

be construed to allow for such drastic unilateral interference by the government, through passage of highly restrictive legislation, the OBPA, with the lessees' bargained for rights of exploitation. Moreover, the government's further restriction of the lessees' rights, by simply legislating away the SOI's ability to consider plaintiffs' POEs, is not a right granted to the government, either expressly or impliedly by these leases. Such a broad and totally nullifying right simply cannot be found within the language of the leases. No provision in plaintiffs' leases even alludes to the government's claimed ability to unilaterally modify or circumvent, with impunity, long established and respected POE approval and permit acquisition procedures established under OCSLA. Sec. 13 of the leases states only that the government could suspend or cancel the lease agreements as provided by § 5 of the OCSLA but would nonetheless have to pay compensation as required by that Act. Actually, Section 5 of the OCS-LA does not discuss suspension of oil and gas leases. However, other portions of that Act provide that the lessor may suspend the leases "if there is a threat of serious, irreparable, or immediate harm or damage to life ... to property ... or to the marine, coastal, or human environment." 43 U.S.C. § 1334(a)(1). The accompanying regulations to the OCSLA confirm this suspension power but state that no such suspension should exceed five years unless it is properly extended. 30 C.F.R. § 250.10.

Accordingly, based upon the plain meaning of the terms of the leases issued in conformity with the OCSLA and all regulations applicable thereto, this court holds that the parties' objectively manifested intent revealed in the above provisions of the leases, precludes finding merit in defendant's interpretation of the leases. In short, the court is convinced that such a significant and external factor, as the OBPA undeniably is—one which would clearly reduce the value and materially alter the structure and framework of plaintiffs' North Carolina lease acquisitions and permit approvals, whether by abating the SOI's authority to consider the same or otherwise—cannot be read into these unambiguous lease terms. Moreover, common sense suggests that no sophisticated oil and gas company with many years of experience in drilling for oil in offshore leased tracts would knowingly agree to pay the huge, up-front considerations here involved for such tenuous and unilaterally interruptable drilling rights. Plaintiffs acted responsibly in their purchase of these leases because the sums of money they paid were for the exclusive right and privilege to drill for, develop, and produce hydrocarbon resources in the leased areas during a specified initial period if they met the requirements of the OCSLA and its implementing regulations. Clearly, had any legislative embargo to the approval process been in the contemplation of the parties at the time of entry into the leases,[9] common sense leads to the conclusion that plaintiffs' winning competitive bids undeniably would have been less, perhaps significantly less.

### 2. Other Considerations

Plaintiffs urge this court to consider the weight of certain out of court statements set forth in plaintiffs' volumes of exhibits. Contract interpretation may be aided by other considerations [10], including an exam-

9. Defendant's legislative actions are inconsistent with the North Carolina leases in that the OBPA evaded the spirit of the bargain by compelling interference with or failure to cooperate in a party's performance. *See* RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (1981); U.C.C. §§ 1-201(19), 1-203. In the present case, defendant's obligation and ability to consider and possibly approve plaintiffs' POEs was fundamental to contract formation and performance. The government's enactment of the OBPA was, as plaintiffs contend, designed to politicize and indefinitely stall the DOI's normal procedures for consideration of POEs, thereby effectively barring the parties from performance of their respective duties under the North Carolina leases

through a mechanism beyond the bounds of the contracts' terms. While this may, on the one hand, bring into question defendant's implied duty of good faith and fair dealing—though not necessarily by the SOI, which as an agency established by Congress is bound to follow Congressional dictates—this court need not decide that question because of the court's independent findings discussed above.

10. The court determines that the North Carolina leases are clear and lend themselves to a plain meaning interpretation. Although the terms referring to "future and subsequent regulations" may have required interpretation, this need for construction does not amount to an ambiguity.

ination of the circumstances surrounding formation, even though such circumstances may not have been included within the four corners of the instrument itself. There are, however, limits to such considerations. The parol evidence rule, a rule of substantive law rather than evidence, bars the introduction of extrinsic evidence antecedent to or contemporaneous with contract formation for the purpose of adding to, subtracting from, varying, or contradicting the terms of a written contract, which is final, complete, unambiguous, and unaffected by mistake, fraud, or accident. *California Sand & Gravel, Inc. v. United States*, 22 Cl.Ct. 19, 25 (1990). That is, where a contract is explicit and its terms unambiguous, the court is not at liberty to search for its meaning beyond the four corners of the instrument itself, and the use of auxiliary tools of contract interpretation, including extrinsic evidence and post-formation circumstances, is impermissible. *Nicholson*, 29 Fed.Cl. at 193–94; *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 27 Fed.Cl. 275, 290 (1992). Nonetheless, certain extrinsic evidence may be used for the

limited purpose of explaining the circumstances affecting a contract by shedding light on the parties' objective intent. *Kmart Corp. v. United States*, 31 Fed.Cl. 677, 681 (1994). However, contract interpretation, with or without extrinsic evidence, may never be used to discern the unilateral subjective intent of one or more of the parties. *Alaska American Lumber Co. v. United States*, 25 Cl.Ct. 518, 528 (1992); *see E.I. Du Pont De Nemours and Co. v. United States*, 24 Cl.Ct. 635, 638 (1991). Further, the significance of extrinsic evidence regarding events occurring after contract formation may be considered to determine whether they constitute modifications to the underlying contract. *Walter Dawgie Ski Corp. v. United States*, 30 Fed. Cl. 115, 126 (1993); *California Sand*, 22 Cl. Ct. at 26. Extrinsic evidence, however, must be distinguished from post-formation evidence that is more probative of subsequent events affecting the contract than of contract interpretation. Plaintiffs' voluminous post-lease moratoria exhibits ("PPLMX"), specifically testimony regarding the OBPA's effect

If, for the sake of argument, the terms of the contract have some degree of ambiguity, any such ambiguity would be latent and the doctrine of contra proferentem, a firmly established doctrine of contract interpretation that places the risk of unfavorable contract interpretation on the party who drafted and proffered the contract provisions in question, would apply. *United States v. Seckinger*, 397 U.S. 203, 216, 90 S.Ct. 880, 887, 25 L.Ed.2d 224 (1970); *United Internat'l*, 33 Fed.Cl. at 370; CIBINIC & NASH, ADMINISTRATION 220–21 (3d ed. 1995). Even if the contract provisions here at issue were ambiguous, the interpretation would remain the same. When contract language is ambiguous, "that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." RESTATEMENT (SECOND) OF CONTRACTS § 206 (1981).

Application of this doctrine is predicated on the requirement that the non-drafter's interpretation be reasonable, *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir.1987), and mandates that latent ambiguities be construed against the drafter, the party with the responsibility and opportunity to reduce the agreement to a coherent, unambiguous, written instrument. *See Orange Cove Irrig. Dist. v. United States*, 28 Fed.Cl. 790, 799 (1993); *Gaston & Assocs., Inc. v. United States*, 27 Fed.Cl. 243, 247 (1992). The one exception to the application of contra proferentem is that the non-drafting party must neither have known nor had reason to know of the ambiguity; i.e., regardless of the

reasonableness of the non-drafter's interpretation, the ambiguity must not have been glaring or so obvious as to invoke the non-drafter's duty to inquire. *Reliable Bldg.*, 31 Fed.Cl. at 644. Interpretation of ambiguous contract terms against the drafter is even more favored when the government dictated the provisions of the contract. *United States v. Seckinger*, 397 U.S. at 216, 90 S.Ct. at 887 (reasoning that the drafting party, the government, had "vast economic resources and stronger bargaining position in contract negotiations"); *Kiewit Sons' Co. v. United States*, 109 Ct.Cl. 390, 418, 1947 WL 5089 (1947) (stating that "[t]his rule is especially applicable to Government contracts where the contractor has nothing to say as to the provisions."); *see also North Star Alaska Housing Corp. v. United States*, 30 Fed.Cl. 259, 268 (1993).

In this case, the government controlled the terms in these and many similar oil and gas leases. Any textual uncertainty was not immediately identifiable, and thus, did not trigger a duty of inquiry by plaintiffs. Application of contra proferentem would require that the provisions of Sec. 1 be construed so as not to include future and subsequent legislation. This conclusion is consistent with the other interpretive tools of contract construction, discussed above, and leads this court to conclude that, although the United States could certainly wield its sovereign power in enacting the OBPA, that act, nonetheless, may not retroactively be applied to the North Carolina leases without regard to and in derogation of plaintiffs' existing rights under the leases.

on the North Carolina leases, fall into this latter category and do not qualify as extrinsic evidence that may be used for the purpose of contract interpretation.

█ The statements made by DOI officials regarding the OBPA are of little value in ascertaining the meaning of the contract terms. They amount to neither extrinsic evidence probative of the parties' understood agreement nor contract modifications. Rather, these statements only constitute one form of legislative history. As far as the North Carolina leases are concerned, these statements occurred after the fact, i.e., after contract formation. Testimony by DOI officials to the effect that obstruction of exploration and development of oil and gas offshore North Carolina through enactment of H.R. 3861, the OBPA, "circumvent[s] the nationwide provisions and standards of the OCS Lands Act" provides little support for plaintiffs' interpretation that the OBPA was not within the scope of the contracts at issue. *Review of Offshore Oil and Gas Programs & Laws, Oversight Hearings on H.R. 3861 Before the Subcommittee on Water, Power, and Offshore Energy Resources of the H.R. Committee on Interior & Insular Affairs,* 101st Cong., 2d Sess. 56 (1990) (testimony of Edward Cassidy, Deputy Director, Mineral Mgmt. Serv., DOI). Moreover, the statements of DOI officials to the effect that "once you issue a lease and then if the government doesn't want to drill there, you find reasons why not, then you have a 'taking' and you've got to buy it back" do not conclusively establish that the bargain struck by the parties did not include a government safety valve through which subsequent legislation could flow, effectively barring oil and gas exploration offshore North Carolina. *DOI & Related Agencies Appropriations for 1990, Hearings Before the Subcommittee on the DOI & Related Agencies of the H.R. Committee on Appropriations, House Appropriations Hearings,* 101st Cong., 1st Sess. 379 (1989) (statement of Manuel Lujan, Jr., SOI, DOI).[11]

█ To some extent, this court can accept plaintiffs' interpretations of the DOI officials' statements regarding the OCSLA leasing program and the effect of the OBPA thereon. Further, it is logical to conclude, as the court has discussed, that subsequent legislation that binds the key agency official's previously existing power to perform under a government contract may amount to a material breach of contract. The court cannot completely ignore the fact that these statements, uttered by high-level agency officials contemporaneous with passage of the OBPA, generally support plaintiffs' interpretation of the leases vis a vis the OBPA. Nevertheless, these statements, which are in the nature of admissions against interest, were made during the OBPA (H.R. 3861) hearing process and may reflect, *arguendo,* only a small cross-section of the DOI and Congressional membership, do not unambiguously explain the proper interpretation of the North Carolina lease terms. In any event, caution must be exercised when referring to statements found in the legislative history, whether they are made by legislators or lobbyists, to glean the intent of Congress vis a vis legislation. *Thompson v. Thompson,* 484 U.S. 174, 191–92, 108 S.Ct. 513, 522, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring); *Piper v. Chris–Craft Indus. Inc.,* 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977). Even greater caution must be used, then, when referring to such evidence to interpret the terms of contracts that were formed

---

**11.** With regard to the Florida and Alaska leases, Secretary Hodel of the DOI stated that exploration "moratoria" would "deny the rights of an oil and gas lease," take away the "contractual integrity" of the leases, and might constitute "act[s] of bad faith on the part of the Federal Government." PPLMX # 10. Secretary Lujan of the DOI observed that such moratoria would be "breaking faith" with the lessees. PPLMX # 21 at 379. Assistant SOI Griles stated that lease restrictions were "inconsistent with the rights of the lessees under their leases" and could constitute "bad faith on the part of the United States."

PPLMX # 76 at 16, 35–36. Similarly, Assistant SOI O'Neal stated that the OBPA was "inconsistent with the terms of the leases" and "put the good faith of the Federal Government in question when post-lease restrictions are imposed on existing leases." PPLMX # 77 at 19, 44–46, 56, 87. The moratoria then at issue included the October 1988 Southwest Florida Leases Appropriations Ban, the October 1989 Bristol Bay Leases Appropriations Ban, the June 1990 Presidential "Off Limits" Decree affecting the Southwest Florida Leases, and the August 1990 enactment of the OBPA resulting in the instant litigation.

many years before the enactment of subsequent legislation, whether or not such legislation has apparent impact upon such contracts.

## II. *Breach of Contract*

### A. The Contracts at Issue

▮▮▮▮ To determine the merits of plaintiffs' claims for breach of contract, the court turns to the lease agreements in question, relying on the meaning ascertained through contract interpretation.[12] Under the lease agreements, plaintiffs paid large sums of money for the "exclusive right and privilege to drill for, develop, and produce oil and gas resources...." The leases, however, are subject to the OCSLA and regulations issued pursuant to it, and, as defendant points out, do not guarantee that plaintiffs will be able to explore and develop the lease areas. Under the existing regulations, plaintiffs must obtain numerous federal and state approvals and certifications before they may explore and ultimately develop the leased areas. However, it is plaintiffs' inability to take part in this regulatory process as a result of the OBPA's restriction on the SOI's approval powers that is at the heart of their claim. Plaintiffs do not claim that defendant is in breach because it has not approved an exploration plan. Rather, they claim defendant is in breach because it cannot and will not even consider an exploration plan—a necessary step in the regulatory approval process. They argue that even if the leases do not clearly state on their face defendant's obligations regarding actual approval of exploration plans, there can be no doubt that defendant is contractually obligated at least to consider them. The court agrees.

The lease agreements do not specifically state the parties' obligations regarding exploration plans but provide that the lessees agree to "comply with all regulations and orders relating to exploration." Under the OCSLA and its regulations, exploration may only be conducted pursuant to approved exploration plans. Thus, in order to explore, plaintiffs are obligated to prepare and submit exploration plans. The necessary reciprocal obligation is that the government will timely and fairly consider—not necessarily approve, but at least promptly consider—exploration plans properly submitted. Indeed, the OCSLA mandates that the Secretary "*shall* approve" exploration plans within thirty days unless determined that the plan "would probably cause serious harm or damage" and the plan could not be modified to avoid such harm. 43 U.S.C. § 1340(c)(1). If, as defendant contends, the government were under no obligation to consider facially compliant explorations plans, plaintiffs' purchases would have been an empty one. It is undisputed that obtaining an approved POE is necessary to plaintiffs' exploitation of their leases. Given the past course of dealing between petroleum companies and the DOI pursuant to earlier leases granted under the OCSLA, it seems apparent that plaintiffs would not have paid millions of dollars in bonuses and rents, if defendant's interpretation of the lease agreements is correct. As already noted, under the lease agreements, defendant was contractually obligated to consider facially compliant POEs promptly and fairly. Any contrary interpretation would render the bargain illusory and subject to unilateral forfeiture. Clearly, the OBPA imposed severe, burdensome, new conditions upon the DOI's obligation under OCSLA to approve POEs offshore North Carolina, which were not contemplated by the parties when the leases were executed. Therefore, the court also finds that compliance with the OBPA compelled governmental breach by non-performance accompanied by an anticipatory repudiation thereby giving rise to "total breach."

---

12. Although plaintiffs briefly argue that recovery be predicated on the doctrines of impracticability of performance and frustration of purpose, respectively, the case at bar does not turn on these theories of risk allocation and excuse of performance. Impracticability applies in scenarios where performance becomes unduly and exceptionally burdensome due to some usually unforeseeable change of circumstances. Frustration applies where unforeseen supervening events, the non-occurrence of which was a basic assumption to the venture, deprives a party of all contractual benefit and utterly defeats the purpose of performance, although there is no actual impediment to performance. The court finds it unnecessary to decide whether these theories of risk allocation lie in light of its breach of contract analysis.

Defendant relies heavily upon the Supreme Court's explanation of the OCS leasing process in *Secretary of Interior v. California*, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984), to argue it was not at all contractually obligated to act on submitted exploration plans. When discussing OCS leases similar to the ones at issue in this case, the Court in *California* noted that:

OCS lease sales are conducted by the [DOI]. Oil and gas companies submit bids, and the high bidders receive priority in the eventual exploration for and development of oil and gas resources situated in the submerged lands of the OCS. A lessee does not, however, acquire an immediate or absolute right to explore for, develop, or produce oil or gas on the OCS; those activities require separate, subsequent federal authorization.

464 U.S. at 317, 104 S.Ct. at 659. But it is the Court's further characterization of the lessees' rights under the leases that defendant cites to show that plaintiffs do not have the rights they assert. The Court stated that OCS lessees receive only "priority over other interested parties in submitting for federal approval a plan for exploration, production, or development." 464 U.S. at 337, 104 S.Ct. at 669. This is, of course, true, and plaintiffs do not contest this. However, it does not follow that the government may then short circuit the entire regulatory process by retracting the SOI's powers to consider submitted plans of lessees whatever their status vis a vis other potential lessees. It is here that plaintiffs' and defendant's interpretations part, for defendant refuses to recognize that the reciprocal rights granted to the parties under the contracts at issue provide that submission of plaintiffs' POEs is predicated on an unequivocal governmental duty to timely and fairly consider, though not necessarily approve, them. The power of approval is, as noted, the SOI's. *See* 43 U.S.C. § 1340(c)(1).

Having found the government contractually obligated to, at the very least, timely and fairly consider plaintiffs' POEs, it is an inescapable conclusion that defendant's failure to do so constitutes a breach. Defendant does not dispute that as a result of the OBPA, it cannot consider plaintiffs' POEs under the North Carolina leases. Since defendant is now legislatively barred from performing, it is in breach. It is not necessary for plaintiffs to have actually submitted such exploration plans because it is clear defendant cannot and will not perform its end of the bargain as required by the OCSLA.

Defendant makes many counter-arguments as to why it is not in breach. None of these arguments directly address the central aspect of its breach. Defendant's strongest response is that it is not in breach because its obligation to consider POEs has not come due. Defendant argues that it has suspended the leases, action defendant claims is allowed by the leases themselves, and concomitantly extended the lease terms so it does not have to consider any POEs. In this respect defendant argues, the regulations to which the leases are subject allow the defendant to suspend the leases. Because the leases have been suspended all obligations under the leases, i.e., paying rent and considering exploration plans, have likewise been suspended. Thus, defendant argues that because its obligations under the leases have also been suspended, it is not in breach. Plaintiffs do not challenge the government's authority or ability to suspend the leases but argue convincingly that, in this case, the suspensions were not effected in accordance with the applicable lease terms.

Of course, if the leases had actually authorized the suspensions here imposed, defendant would not be in breach. In that case, plaintiffs' rights to have POEs considered would likewise be suspended. That, however, is far from the case. The leases contain a provision relating to suspending the leases, according to which "[t]he Lessor may suspend or cancel this lease pursuant to Section 5 of the [OCSLA] and compensation shall be paid when provided by the Act." Perhaps more importantly, the leases indicate that they are subject to the OCSLA, all regulations promulgated thereunder, and all applicable statutes then-existing, which this court has determined does not include subsequently enacted legislation such as the OBPA. Thus, the extent to which the suspensions were proper under the terms of the lease

contracts depends on whether such suspensions occurred pursuant to the OCSLA and its regulations. Plaintiffs argue that the denial of their rights under the leases cannot be justified by defendant's authority under the OCSLA and its regulations, because the OCSLA contemplates only "suspension" or "temporary prohibition," not open-ended, indefinite bars. Further, plaintiffs contend that, in any event, suspensions are justified only under defined circumstances, for example, if there is a threat of serious irreparable, or immediate harm. Plaintiffs argue that the facts show that the government, quite to the contrary, unilaterally suspended the leases not because of any such threat of harm, but rather because of the OBPA.

Under the OCSLA the Secretary can establish regulations:

> (1) for the suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease ... *if there is a threat of serious irreparable, or immediate harm* or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment....

43 U.S.C. § 1334(a) (emphasis added). The Secretary set forth regulations concerning suspension of the leases at 30 C.F.R. § 250.10, which sets out the situations under which the OCS leases may be suspended. Defendant attempts to justify its suspension actions under these regulations. Section 250.10(a) authorizes suspensions when additional time is needed for such things as facilitating proper development of leases, constructing transportation facilities, entering into sales contracts, and unforeseen delays due to such things as weather. Under 30 C.F.R. § 250.10(b), suspensions are authorized for such reasons as the lessee's failure to comply with provisions of law or the lease, in the interest of national security, conducting an environmental study and threat of serious, irreparable, or immediate harm or

damage. Finally, suspensions under this section should not exceed five years.

The suspension notices sent to plaintiffs invoke defendant's suspension powers under 30 C.F.R. § 250.10 but state that the suspension is necessary in order to comply with the OBPA. The notices do not point to any environmental threats, risks of harm to life or the environment, or any other justification set forth in the regulations and the OCSLA. Indeed, the June 1990 Environmental Report, "the most extensive and intensive environmental examination that had ever been afforded an exploration well in the OCS program," determined that the proposed exploration would not result in any significant impact on the Outer Banks marine environment. Defendant now argues that, while not stated in the suspension notices, the leases were suspended to conduct further environmental studies as is authorized under § 250.10(b)(4).[13] However, such post hoc rationalizations must be viewed critically. *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 765, 572 F.2d 786, 815 (1978) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971)). Defendant further argues that the lease suspensions must have been consistent with the terms of the lease contracts because plaintiffs themselves have "stipulated that the 'person who executed [the] suspension order[s] [subsequent to enactment of the OBPA] on behalf of the United States possessed authority to do so." *Df.'s Motion for Summary Judgment* at 44. This argument is unpersuasive. Merely because it is within an official's authority to take certain action is entirely a separate issue from whether such action was properly taken. The real issue is whether the Secretary's suspension of the leases pursuant to the OBPA breached the contracts, not whether it can be justified retroactively. *See Gulf Oil Corp. v. Morton,* 493 F.2d 141, 146

---

**13.** 30 C.F.R. § 250.10(b) provides:

... *suspension of any operation or activity, including production, because of the following:*

\* \* \* \* \* \*

(4) The suspension is necessary for the implementation of the requirements of the National Environmental Policy Act or to conduct an environmental analysis;

(9th Cir.1973); *Union Oil Co. v. Morton,* 512 F.2d 743, 747–49 (9th Cir.1975).

The court agrees with plaintiffs that the reasons given for the suspensions were not the type contemplated by the OCSLA, and thus were neither agreed upon by plaintiffs nor incorporated into the bargain at the time of contract formation. The suspension notices state that the leases were suspended in order to comply with the OBPA. The OCSLA, however, already provided a detailed and comprehensive framework of regulatory procedures for the OCS oil and gas leasing program. The OCSLA provides that if the SOI determines that exploration plans were consistent with the OCSLA's environmental guidelines, he "shall approve" them. If not, i.e., if the plans are likely to cause serious injury to life, property, or the environment, then he shall reject them. 43 U.S.C. § 1340(c)(1). The OCSLA provides a coherent scheme for the OCS program, and it was that scheme only around which the parties formed their contracts. In signing the leases, plaintiffs agreed to subject themselves to the OCSLA and the regulatory scheme surrounding it, but they could not have envisioned themselves being bound by the OBPA. Plaintiffs were aware that only in certain circumstances (for example, in case of a threat of serious harm) [14] could their leases be suspended or cancelled. Indeed, in certain instances plaintiffs themselves might have requested such action. What they did not agree to, however, was that the leases could be unilaterally suspended indefinitely through a mechanism beyond the scope of the OCSLA. The parties did not contemplate at the time of formation that the leases could be suspended because, some nine years later, Congress would want to promote new policies on enhanced environmental protection by, among other actions, halting development of the OCS offshore North Carolina.

This was within neither the words nor the spirit of the lease agreements. Thus, the court finds that defendant's actions are not justified as mere lawful, authorized suspensions of the leases but material breaches of the lease contracts.

Further evidence that the suspensions were not the type bargained for in the leases is the duration of the suspensions. Section 250.10(e) provides that the suspensions should not exceed five years. Except under limited circumstances, OCSLA establishes that leases must be suspended for five years before they may be cancelled. That the OCSLA provides a mechanism to cancel leases after a prolonged suspension period demonstrates that it only intended suspension be of a limited duration. Significantly, many of the suspension notices directed plaintiffs to this section of the OCSLA stating that the leases must be suspended for a period of five years before cancellation. The OCSLA contemplated that suspensions would be of a limited nature and not indefinite bars to exploration. The court in *Union Oil,* construing similar OCS leases, likewise found that a suspension "by definition possesses a 'temporary nature.' " 512 F.2d at 750. Continuing, that court acknowledged the SOI's broad suspension powers for conservation of natural resources but found, "Congress clearly did not intend to grant leases so tenuous in nature that the Secretary could terminate them, in whole or in part, at will." *Id.*

Defendant's counsel admitted during oral arguments that defendant has no idea how long these suspensions will continue, that there is no evidence that the suspensions will be lifted anytime in the future, and that the United States is not waiting for the completion of any studies or the results of any tests or any additional information before acting on the suspensions. The suspension in *Gulf*

---

**14.** The regulations prescribed by the Secretary under this subsection shall include, but not be limited to, provisions—

(1) for the suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit (A) at the request of a lessee, in the national interest, to facilitate proper development of a lease or to allow for the construction or negotiation for use of transportation facilities, or (B) *if*

*there is a threat of serious, irreparable, or immediate harm or damage* to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment, and for the extension of any permit or lease affected by suspension or prohibition under clause (A) or (B) by a period equivalent to the period of such suspension or prohibition ...
43 U.S.C. § 1334(a) (emphasis added).

*Oil* thus differs from those in the case at bar because the latter were not prompted by the SOI's imminent concerns about risks to the marine ecosystem. *See* 493 F.2d at 144–45. It seems clear that the leases neither provide for nor even implicitly contemplate the type of open-ended, indefinite suspensions present in this case. The government's reliance on the Secretary's limited suspension powers to avoid breach of contract, therefore, is misguided and misplaced.

Plaintiffs have convinced the court that under the leases they were entitled to fair consideration of their POE's, the essential first step to exploitation of their leases. The court completely agrees with plaintiffs' interpretation of the leases that there can be no doubt that the lessor is contractually obligated to consider and act on POEs submitted by lessees regardless of the fact that the defendant's obligations are not stated definitively by express language in the leases. Again, as plaintiffs argue, an "interpretation of the leases that would allow the United States as lessor to fail to act on POEs, after requiring large up-front bonuses and lessor approval of POEs, would create an illusory bargain and permit unilateral forfeitures of lease bonuses, putting lessees entirely at the mercy of the United States." For all of the foregoing reasons, the court holds that defendant's failure, under the restrictions adopted pursuant to the OBPA, was a material breach of the leases. Accordingly, plaintiffs are entitled to a monetary recovery in this proceeding.

B. The Impact of Subsequent Legislation on a Government Contract Involving a Highly Regulated Industry

The U.S. Court of Appeals for the Federal Circuit has recently discussed the force and effect of subsequent legislation on the issue of breach of a government contract involving a highly regulated industry. In *Winstar Corp. v. United States,* 64 F.3d 1531 (Fed. Cir.1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 806, 133 L.Ed.2d 753 (1996), the Federal Circuit confronted some of the same issues presented by the case at bar. Indeed, the parties to this case have taken advantage of every opportunity to bring to this court's attention the significance, or lack thereof, of the Federal Circuit's decision in *Winstar* to affirm this court's holding in that case. *See Pl.'s Motion for Leave to File Recent Appellate Opinion, Df.'s Response, Pl.'s Reply, Df.'s Report of the Effects of the Decision in Winstar,* and *Pl.'s Response to Df.'s Report.* In short, the Federal Circuit, sitting *en banc,* affirmed this court's decision that the government, by enacting the Financial Institution Reforms, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183, as codified in relevant part by 12 U.S.C. § 1464 *et seq.,* breached its express and implied contracts with plaintiffs, the Winstar Corporation ("Winstar"), the Statesman Bank ("Statesman") and Glendale Federal Bank ("Glendale"). The Federal Circuit reasoned that where future or subsequent legislation contradicts the intent of the parties to a contract, the United States may be liable for breach under certain circumstances despite the sovereign acts doctrine. Clearly, *Winstar* is apposite. Therefore, the following, more detailed examination of the *Winstar* decision will help explain the resolution of this case.

*Winstar* presented a case in which financial institutions had formed express and implied contracts with the United States in the highly regulated field of banking. Originally, the plaintiffs, Winstar, Statesman and Glendale, had consolidated their actions in the Court of Federal Claims. This court found that the government had breached its contracts with the plaintiffs by enacting subsequent legislation, the FIRREA. The contracts at issue allowed the financial institutions to take advantage of special accounting treatment in their acquisition of failing thrifts. Specifically, the contracts permitted the plaintiff financial institutions to calculate a special type of goodwill, an intangible asset representing the ability of a business or financial institution to generate income due to business reputation, market position, management, technology, and other elusive indications of earning power. In the savings and loan ("S & L") industry, "supervisory goodwill" represents the difference between the fair market values of a failing thrift's current assets and its liabilities assumed by the acquirer and is normally amortizable

over a straightline basis over a number of years. Under the contracts at issue:

> The Bank Board and the FSLIC [Federal Savings and Loan Insurance Corporation] allowed the merged thrifts to count this supervisory goodwill toward the minimum regulatory capital requirements and to amortize this goodwill over periods of up to 40 years. This permitted the healthy thrift to assume the deposit liabilities of the failing thrift and to have capital compliance without having to put up large amounts of its own money and without requiring large amounts of monetary assistance from the government.

*Id.* at 1536. In 1989, Congress responded to a financial crisis that had overcome the S & L industry by enacting the FIRREA, which significantly impacted the regulatory scheme of thrift mergers and acquisitions.

> As pertinent here, it (1) abolished the FSLIC and transferred its functions to other agencies; (2) created a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation ("FDIC"); (3) eliminated the Bank Board and replaced it with the Office of Thrift Supervision ("OTS"), an office within the Department of the Treasury and made the OTS Director responsible for the regulation of all federally insured savings associations and the chartering of federal thrifts; and (4) established the Resolution Trust Corporation ("RTC"), which was charged with closing certain thrifts. *See* 12 U.S.C. §§ 1437 note, 1441a, 1821.

*Id.* at 1538. More significantly, the FIRREA "greatly reduced the amount of supervisory goodwill that could be used to meet regulatory capital requirements." *Id.* at 1544–45 (citing 12 U.S.C. § 1464(t)).

The plaintiffs filed suit in this court alleging that the government was liable for breach of contract and an unconstitutional taking without just compensation in violation of the Fifth Amendment by restricting the availability of supervisory goodwill and capital credits to satisfy the regulatory capital requirements of the plaintiffs as previously allowed prior to the enactment of the FIRREA. *Id.* at 1539. In its defense, the government argued that plaintiffs did not have the contractual rights they alleged. More importantly, defendant, relying heavily on *Bowen v. Public Agencies Opposed to Social Security Entrapment ("POSSE")*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), challenged plaintiffs' claims by arguing that "the alleged agreements were subject to [subsequent] statutory and regulatory challenges." *Winstar*, 64 F.3d at 1539. *POSSE* states that " 'sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.' ... Therefore, contractual arrangements, including those to which a sovereign itself is a party, 'remain subject to subsequent legislation.' " *POSSE*, 477 U.S. at 52, 106 S.Ct. at 2392 (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 147–48, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)). In support of its position, the government cited a clause in the contract reading, "Nothing in this Agreement shall require any unlawful action or inaction by either of the parties hereto." *Winstar*, 64 F.3d at 1542. Defendant argued that the *Winstar* plaintiffs "impermissibly sought to enjoin Congress' power to legislate and the agencies' power to regulate." [15] *Id.* The Federal Circuit disposed of these arguments by reasoning that the government's *POSSE* arguments " 'mischaracterized the plaintiffs' claim as one which improperly seeks to bind the government's power to regulate.' Rather, the [U.S. Court of Federal Claims] noted that plaintiffs sought only money damages, which did not implicate the government's power to regulate." *Id.* at 1545–46 (citing this court's decision with approval).

The breach of contract issues presented by the case at bar bear striking similarities to those addressed by the Federal Circuit in *Winstar*. Specifically, to what extent can the government be held liable for breach of contract when the alleged breach stems from subsequent legislation or regulation, which

---

**15.** The government also asserted the sovereign acts doctrine and the unmistakability doctrine as defenses, claiming that they precluded any recovery by plaintiffs for governmental breach of contract. *Winstar*, 64 F.3d at 1539. These doctrines are discussed *infra* at *III. Other Defenses.*

clashes with the terms of a public contract in a highly regulated industry or the objectively manifested intent of the parties thereto in a highly regulated industry? Although the Federal Circuit in *Winstar* did not venture to set forth a precise test, it did consider factors that help clarify whether subsequent legislation may give rise to governmental liability for breach of contract. First, the parties' objective intent, to the extent it can be crystallized from the contract terms reduced to writing, is probative of the force and effect of subsequent laws. Second, the presence of an integration clause strongly suggests that the contract was the sole embodiment of the bargain. A non-integration clause, or a clause referring to terms not found in the contract document, therefore, is evidence that the agreement is subject to external conditions or requirements, whether statutory, regulatory, or otherwise. Third, if the contract on its face would subject one or more of the parties to "regulatory noncompliance and penalties" when read in light of the subsequent governmental action in question, it would defy reason to hold the agreement subject to such an outright restriction. Finally, the Federal Circuit reasoned that a prior agreement, when contradicted by subsequent legislation, does not constitute a mere statement of "then-current prosecutorial and regulatory policy" once the parties have become bound by specific terms through mutual assent. *Id.* at 1541–42.

In this case, the first of these considerations supports plaintiffs' position that the subsequent legislation here at issue, the OBPA, violates the North Carolina leases. The objective intent of the parties seems clear—plaintiffs paid the oil and gas lease bonuses and rental payments in consideration for at least the opportunity to explore and develop the OCS. As plaintiffs point out, no one would pay such an exorbitant premium for interests that could potentially be rendered worthless, and that is in effect what the OBPA accomplishes by prohibiting the approval of any exploration, development, or production plans, nor any application for permit to drill until the later of October 1, 1991, or 45 days of continuous Congressional session following "submission of a written report to the Congress by the Secretary of the Interior, made after consideration of the findings and recommendations of the Environmental Sciences Review Panel." 33 U.S.C. § 2753(c)(1). To the extent the parties' intent sheds light on the applicability of subsequent legislation, it is most doubtful that they intended that the North Carolina leases be governed by future or subsequent legislation such as the OBPA, which was enacted approximately seven years after the last disputed contract was formed.

The second *Winstar* consideration, the inclusion and scope of an integration or non-integration clause, may shed light in the case at bar on whether the disputed bargain was struck subject to future or subsequent legislation. *See* 64 F.3d at 1541. On the one hand, the North Carolina lease agreements contain a provision in Sec. 1, which reads that the lease agreements were issued pursuant to the OCSLA of August 7, 1953, and subject to: "[that] Act; all regulations issued pursuant to the statute and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute *in the future* ... and all other applicable statutes and regulations." SXs 128–180, Sec. 2 (emphasis added). This provision may not be read as an integration or nonintegration clause, but rather as a provision incorporating other terms by reference. This, however, does not necessarily mean that the contracts are subject to *all* subsequent statutes and regulations. Legislative acts that lie beyond the scope of this clause still may not alter, vary, or contradict the terms of the North Carolina lease agreements. The key to the linchpin, then, is to determine which legislative acts fall within the scope of Sec. 1. Through contract interpretation, this court has determined that future, subsequent statutes were not contemplated by the North Carolina lease agreements, much less statutes that suspended the leases through means beyond the scope of Sec. 13 of the contracts. Had the parties intended this to be the case, the government could have made this clear in drafting Sec. 1 of the leases. Despite the government's claims that the OBPA has retroactive effect, plaintiffs, *in* performing under the contracts at issue, were not "contractually bound" to comply

with the OBPA. *See* 64 F.3d at 1541. Ultimately, while the second *Winstar* consideration is somewhat illuminative on the issue of breach, it does not provide conclusive support for either parties' motion.

■ The third consideration discussed in *Winstar* deals with regulatory noncompliance and penalties. That is, if a party to a contract would be subject to penalties for regulatory noncompliance but for the availability of certain special treatment accorded by the contract, then it is probable that subsequent legislation that eliminates such exceptional treatment is ineffective against those contractually bound parties. 64 F.3d at 1542. In this case, plaintiffs faced no such risk, except to the extent that any party attempting to explore and develop oil and gas resources on the OCS without a valid permit would be subject to applicable regulatory sanctions. As in *Winstar*, plaintiffs in the present case acquired their unique business opportunities solely as a result of contract formation. In both cases, subsequent legislation sought to deprive plaintiffs of a substantial portion of those opportunities. In this case, the legislation was narrowly tailored to target the specific contracts and sought to abate the accompanying rights here at issue.

■ Finally, the Federal Circuit in *Winstar* considered whether rights vested through contract formation can be overridden by future or subsequent legislation or regulation when the understood terms of the agreement amount to no more than a manifestation of "then-current prosecutorial and regulatory policy." *Winstar*, 64 F.3d at 1542. That court reasoned that the government's argument that contract terms bestowing special treatment upon parties may be disregarded as a mere statement of policy was of no moment.

> Once specific terms as to the [contract terms] were incorporated in a negotiated arm's length contract, both parties were bound to them. While it is true as the government argues that a statement of policy ... could be changed (which it later was), the contract could not be changed except by mutual consent.

*Id.* In the case at bar, the government does not go so far as to say that the provisions of the OCSLA were mere statements of environmental regulatory policy. Defendant does, however, suggest that where the two acts conflict, enactment of the OBPA supplants the OCSLA and, accordingly, controls the North Carolina leases thereafter. Thus, defendant argues that this court should grant its motion for summary judgment. Defendant's argument is without merit. In fact, granting defendant's motion would deprive both parties of the benefits of their bargain. This court finds that the government's implication that changing policies on environmental regulation, such as the OBPA, can subvert the parties' mutual assent, reduced to writing and memorialized in contract, rings hollow. "When performance of a duty under a contract is due any non-performance is a breach." RESTATEMENT (SECOND) OF CONTRACTS § 235(b) (1981), *cited inter alia by Winstar*, 64 F.3d at 1545. This court finds that defendant breached the North Carolina lease agreements by enacting the OBPA and subsequently implementing its provisions in derogation of plaintiffs' rights under those agreements.

## III. *Other Defenses*

■ As a defense to plaintiffs' claims of breach of contract, the government contends that the sovereign acts doctrine shields it from liability. It is a well-settled point of law that the sovereign acts defense is included as an inherent term, whether express or implied, in every public contract. *Hughes Communic. Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed.Cir.1993). The sovereign acts doctrine has its genesis in the proposition that the government acts in a dual capacity—as both a contractor and a sovereign—and should not be held liable in contract for acts it performs as a sovereign. *See Jones v. United States*, 1 Ct.Cl. 383, 384–85, 1865 WL 1976 (1865); *Deming v. United States*, 1 Ct.Cl. 190, 191, 1865 WL 2004 (1865). This is necessary to allow the government to function properly unimpaired. The government, when acting as sovereign for the public welfare, cannot be expected to know, consider, or be held accountable for all of the many contracts it enters into as a contractor for the public welfare. *See Jones,*

1 Ct.Cl. at 384–85. The sovereign acts doctrine, however, is not intended to shield all government actions from liability for breach of contract. If all government actions qualified as sovereign acts, the government would be able to abrogate all of its public contracts without risk of liability for damages. *See United States v. Bostwick,* 94 U.S. 53, 68–69, 24 L.Ed. 65, (1876) (reviewing the decision of the Court of Claims and reasoning that the government contractually assumes responsibility for government acts that contravene its contractual obligations). The distinction between the two types of governmental actions, i.e., government *qua* sovereign versus government *qua* contractor, turns on the nature of the actions involved. *Hughes Communic. Galaxy,* 998 F.2d at 958–59 & n. 8.

 In order for defendant to assert successfully the sovereign acts doctrine as a defense, the government must demonstrate that the alleged breach constituted an act by the sovereign that was "public and general in nature," not private and contractual. *Horowitz v. United States,* 267 U.S. 458, 460–61, 45 S.Ct. 344, 344–45, 69 L.Ed. 736 (1925); *Orlando Helicopter Airways, Inc. v. Widnall,* 51 F.3d 258, 262 (Fed.Cir.1995) (stating that "[t]he focus of the inquiry is thus the nature of the conduct, not the identity of the government agent responsible."). In *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786 (1978), this court's predecessor determined that the SOI's denials of offshore oil permits did not merit sovereign acts immunity since they "were not actions of public and general applicability, but were actions directed principally and primarily at plaintiffs' contractual right[s]." *Id.* at 768, 572 F.2d at 817. Indeed, governmental acts that directly or intentionally, as opposed to incidentally, impede specific contracts rather than promote the public interest are not sovereign acts within the meaning of this defense. *A fortiori,* a governmental act whose effect was specifically designed to obstruct performance is not a sovereign act. *See* CIBINIC & NASH, ADMINISTRATION 367–70 (3d ed. 1995). Perhaps most importantly, the Federal Circuit has recently drawn a fine distinction between those cases in which the sovereign acts doctrine is material and those in which it is not. While "contractual arrangements, including those to which a sovereign itself is a party, 'remain subject to subsequent legislation' by the sovereign," the Federal Circuit agreed with this court in regarding *POSSE* as being inapposite in cases where the sovereign's power to legislate was not at issue and where the plaintiffs sought only damages rather than to bind the sovereign's legislative or regulatory powers. *Winstar,* 64 F.3d at 1545–46 (quoting *POSSE,* 477 U.S. at 52, 106 S.Ct. at 2392). As applied here, plaintiffs do not contend that the government is without legislative power as a sovereign to prohibit lease exploration, but only that its decision to do so through the OBPA gives rise to liability for damages for breach of contract.

 The unmistakability doctrine, a corollary to the sovereign acts doctrine, states that the government never surrenders its legislative or regulatory powers unless the legislation authorizing the government to enter into the contracts at issue states otherwise in unmistakable terms. Put another way, the United States may avoid liability for breach of contract for acts it undertakes as a sovereign unless it explicitly agrees to be contractually bound in unmistakable terms. *Hughes Communic.,* 998 F.2d at 958; *see also POSSE,* 477 U.S. at 52, 106 S.Ct. at 2392; *Transohio Sav. Bank v. Director, OTS,* 967 F.2d 598, 618–19 (D.C.Cir.1992). The unmistakability doctrine stands or falls with the sovereign acts doctrine. *Resolution Trust Corp. v. FSLIC,* 34 F.3d 982, 984 (10th Cir.1994). In the case at bar, the government's disputed act flows from enactment of the OBPA. Defendant argues that the OBPA is a public and general act of the government in its capacity as a lawmaker and, therefore, constitutes a sovereign act. According to defendant, the government was acting in its sovereign capacity to safeguard the environment. In support of this argument, defendant points to the structure of the OCS leasing program. According to defendant, the government, in leasing the OCS, was acting in both its sovereign and proprietary capacities because the OCS leases were specifically subject to the SOI's regulatory authority to preserve the natural resources of the OCS. Defendant thus suggests that

laws affecting the environment are sovereign acts, public and general in nature, and that the government never surrendered its sovereign powers or immunity.

██ It is true that under the OCSLA the Secretary may promulgate regulations to protect the environment and that plaintiffs' leases are subject to those regulations. It is not true, however, that all of the government's actions taken to protect the environment are sovereign acts. The notion that an agency official could simply, through regulation, declare plaintiffs' leases null and void and avoid contract liability by citing environmental concerns was squarely rejected by this court in *Everett Plywood Corp. v. United States*, 227 Ct.Cl. 415, 651 F.2d 723 (1981). In that case, the plaintiff was the successful bidder on a contract with the National Forest Service for the sale of timber. Because of environmental concerns, the government terminated the timber contracts. This court rejected the government's argument that it was acting as a sovereign. 227 Ct.Cl. at 422, 651 F.2d at 728. Similarly, in *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, (1978), this court rejected the argument that merely expressing a desire to protect the environment turns an action into a "sovereign act." *Sun Oil* involved an OCS lease, similar to the ones at issue, that was also subject to the SOI's environmental regulations. The court, however, rejected the government's argument that the Secretary's denial of a permit to install an oil platform based on environmental considerations was a sovereign act. 215 Ct.Cl. at 768, 572 F.2d at 817. While the government has broad powers to regulate the environment, its actions are not necessarily sovereign acts merely because they are done in the name of environmental protection.

██ While the OBPA may have been the result of developing environmental concerns, it was not an act of public, general applicability. Further, the OBPA affected the public welfare incidentally at most. That act was "principally and primarily" enacted to restrict the SOI's ability to act on plaintiffs' POEs, thus binding his hands. The OBPA specifically targeted plaintiffs and prevented them from exercising their lease rights. It

was specifically enacted to delay indefinitely plaintiffs' exploration of the OCS offshore North Carolina. *See Freedman v. United States*, 162 Ct.Cl. 390, 402, 320 F.2d 359, 366 (1963) ("The doctrine ... does not relieve the government from liability where it has specially undertaken to perform the very act from which it later seeks to be excused"). As previously explained, plaintiffs in this case do not challenge the government's authority to enact the OBPA. They ask only for the benefit of their bargain or at least to be made whole by recovering the damages resulting from the enactment and enforcement of the OBPA. As in *Winstar*, this court concludes that the United States' sovereign power is not at issue in this case. The OBPA does not constitute a sovereign act. "The terms of a government contract, like any other contract, do not change with the enactment of subsequent legislation absent a specific contractual provision providing for such a change." *Winstar*, 64 F.3d at 1547. The sovereign acts doctrine is no bar to plaintiffs' claims for damages for breach of contract. After carefully considering defendant's arguments, the court finds that neither the sovereign acts doctrine nor the unmistakability doctrine shields defendant from the liability the United States would otherwise bear for breach of contract. Thus, the court holds that as a result of the OBPA, defendant breached the North Carolina leases through its unilateral actions in suspending plaintiffs' leases, resulting in its failure to give plaintiffs' POEs full and fair consideration.

### IV. Fifth Amendment Taking Claims

██ The Fifth Amendment prohibits the government from taking an interest in private property "for public use without just compensation." This clause is not a grant of power, but rather, a limitation on the exercise of power. Plaintiffs have stated no taking claim as to the North Carolina lease interests in their cross-motions for partial summary judgment. They have, however, failed to respond to defendant's motion for summary judgment on the taking issue. Defendant, citing *Southern Nev. Shell Dealers Assoc. v. Shell Oil Co.*, 725 F.Supp. 1104,

1109 (D.Nev.1989), argues that its motion, therefore, is unopposed and must be granted. RCFC 56(f), which conforms to the corresponding Federal Rule of Civil Procedure ("FRCP") 56(e), states:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of such party's pleading, but such party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If such party does not so respond, summary judgment, *if appropriate,* shall be entered against such party.

(Emphasis added.) *See also Sweats Fashions, Inc.,* 833 F.2d at 1562, 1565. Given the fact-intensive nature of a takings analysis and the evidence currently before the court, the government has not convinced this court that there are no material issues of fact rendering judgment as a matter of law appropriate. Accordingly, summary judgment on the taking issue cannot be granted at this phase of litigation.

### CONCLUSION

After careful consideration of the oral testimony, exhibits, arguments, and the applicable law, the court denies defendant's motion for summary judgment and grants third-party plaintiffs' cross-motion for partial summary judgment on the breach of contract claims. The court denies defendant's motion for summary judgment on the Fifth Amendment taking issue.

With respect to the amount of damages to which the remaining plaintiffs may be entitled for breach of contract, the court will hold a formal status conference to discuss with the parties a schedule for resolution of the issue of the quantification of damages to be awarded.

IT IS SO ORDERED.