EASTERN MINERALS INTERNATIONAL, INC., et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 94–1098 L.

United States Court of Federal Claims.

Oct. 2, 1996.

Raymond D. Battocchi and John R. Powell, McLean, VA, for plaintiffs.

Marc A. Smith, United States Department of Justice, Washington, DC, for defendant.

## OPINION & ORDER

HODGES, Judge.

This case is before the court after trial on the merits. Plaintiffs allege a taking of their property interests, and they seek just compensation.

### Facts

The Wyatts purchased property in eastern Tennessee in 1953. In 1975, the Wyatts entered an installment contract to sell some of the land to Milton Bernos, and they retained a royalty interest. The parties later amended the contract to extend the closing date and increase the Wyatt's royalty interest to 3.5% of the gross sales price on all coal mined from the property. The 1975 contract was canceled in 1978.[1]

Congress enacted the Surface Mining Control and Reclamation Act in 1977. SMCRA required states to develop regulatory programs for mining or submit to a federal program. It also established permitting requirements and prohibited surface mining without a permit. Until 1982, Tennessee administered the Act under federal provisions. In August 1982, Tennessee received conditional approval of a permanent regulatory program. In 1984, the Interior Depart-

---

1. The cancellation agreement provided that in exchange for the principal payment of $175,000, the Wyatts conveyed 175,000 tons of coal to Bernos.

ment's Office of Surface Mining assumed direct federal enforcement of Tennessee's program.

Cane Company bought property from the Wyatts in 1979. The Wyatts retained a 3.5% royalty interest. Cane leased the property to Eastern Minerals International, a company that Bernos formed in 1979. Eastern had the exclusive right to mine coal on the property. The lease was to expire in February 1991, but Eastern could extend the lease for four additional ten-year terms. Colten Company and Van Buren Minerals had a similar agreement. Van Buren is another company formed by Bernos in 1979.[2]

The Tennessee Department of Conservation, Division of Surface Mining granted Eastern two one-year permits to disturb 33 acres of the Cane property to mine underground coal. Eastern excavated a box cut on the property to mine in the Sewanee Seam, and it constructed a sediment pond, a backfill area, and roads to and from the box cut. The last permit expired in 1982.

SMCRA prohibits surface coal mining operations that will adversely affect any publicly owned park, unless it is approved by regulatory authorities. The Tennessee DSM made no explicit finding of adverse effect. Defendant contends that the first two Eastern permit applications were not subject to the adverse effects provision. According to the Government, the provision was included in Tennessee's 1982 conditionally approved plan.

Eastern applied to DSM for a third permit in 1982. DSM denied the permit in 1984, and Eastern appealed to the Tennessee Board of Reclamation Review. The Tennessee Commissioner required Eastern to withdraw its application and submit an administratively complete application. In 1984, the Office of Surface Mining assumed federal enforcement of Tennessee's program and set forth the standards applicable in Tennessee. After that, Eastern submitted its permit application to OSM rather than to DSM.

OSM denied Eastern's permit on July 2, 1986. Its reasons for denial were excessive noise and probable hydrologic consequences. Eastern appealed the permit denial. An administrative law judge heard the appeal in June 1987. He asked OSM to make findings concerning hydrologic and noise impacts. OSM agreed to render a complete decision on adverse effects including hydrological effect and noise.

Eastern's right to extend its lease expired on August 31, 1990. Plaintiff did not extend the lease because it did not want to incur additional rent liability. Eastern believed that OSM would never grant the permit. Bernos and Eastern continued to pursue the permit application because they hoped to negotiate a lease extension with Cane. OSM denied Eastern's permit in April 1994 because Eastern had not provided certain information requested in a technical deficiency letter.

### Plaintiffs' Arguments

Plaintiffs argue that:

(1) They have suffered a categorical taking, relying on the three-pronged test set forth in *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1179 (Fed.Cir.1994). According to plaintiffs, (a) the Government has denied them economically viable use of their property; (b) they had distinct investment-backed expectations; and (c) the character of the governmental action rises to the level of a taking.

(2) Eastern and Van Buren lost their leases as a result of OSM's refusal to grant Eastern Minerals a permit to mine, and the Wyatts' 3.5% royalty interest was rendered worthless. A taking occurred on or about August 31, 1990, when Eastern lost its right to extend its lease, because of the Government's extraordinary delay in rendering a decision on the permit application.

(3) Bernos entered into a contract to buy property from the Wyatts to profit from mining coal. Likewise, Eastern and Van Buren entered into leases with Cane and Colten solely to make a profit.

2. According to plaintiff, all of the properties purchased by Cane and Colten were part of the property initially purchased by the Wyatts and included in the property Bernos contracted to purchase in 1975. Defendant contends that this fact is irrelevant.

(4) The Wyatts purchased the subject property to arrange for coal mining, and reserved a royalty interest when they contracted with Bernos and Cane so that they could profit from the coal mining operations.

(5) Plaintiffs' expectations were reasonable at all times. Before SMCRA, no federal permit requirements existed. After SMCRA, expectations were reasonable because mining had occurred on the property for many years and permits had been granted. Plaintiffs' investment of funds in reliance on the permits was reasonable.

(6) Coal mining cannot be prohibited on the subject property by Tennessee's common law nuisance doctrine because mining occurred regularly from 1953 to 1981. Possible noise and lowered water quality do not qualify as nuisances.

### Defendant's Arguments

Defendant argues that:

(1) Plaintiff Bernos does not have standing because none of the property interests allegedly taken was owned by Bernos on the date of taking. Additionally, the permit application that forms the basis for plaintiffs' claims was filed by Eastern Minerals and not by Bernos. Even a sole shareholder does not have standing to assert a claim in his own name for a wrong to a corporation.

(2) Plaintiffs Mary Anne Wyatt, Nancy Wyatt Zorn, and Wilson W. Wyatt, Jr. also have no standing to sue because they did not acquire their interests in the subject property until after the alleged date of taking.

(3) Plaintiff Van Buren's claims are not ripe because it never sought a mining permit from OSM.

(4) Plaintiff Eastern Mineral's claims are only partially ripe because it applied for a permit to mine on only one of its five tracts. Eastern's failure to apply for permits to mine the other tracts renders takings claims regarding those tracts premature and that only claims relating to the lands subsumed in the 1984 permit application are ripe.

(5) Plaintiffs identify no final agency action on the alleged date of taking that could trigger a right to just compensation. Plaintiffs must base regulatory takings claims on final agency action because a claim cannot be evaluated until the agency has arrived at a definitive position regarding how to apply the regulation at issue.

(6) Two final agency actions could form the basis of a takings claim, but a claim based on either date must fail. Plaintiffs' mining application was denied in July 1986 and in April 1994. The 1986 claim is barred by the statute of limitations, and the 1994 claim deprives plaintiffs of standing because they no longer owned the lease in 1994. Plaintiffs chose neither date as the basis of their claim, but argue that the taking occurred in 1990.

(7) Delay cannot form the basis of a permanent takings claim.

(8) Plaintiffs have not shown economic impact, investment-backed expectations, or that the character of governmental action rises to the level of a taking. Because plaintiffs base their economic impact argument on extraordinary delay, plaintiffs can claim only a temporary taking. No case holds that delay can result in a permanent taking.

(9) Alternatively, plaintiffs or factors beyond government control caused any extraordinary delay.

(10) Plaintiffs' interests had no value before the governmental action; they have not suffered economic impact. The Cane property had a negative value after applying the discount rate, and the Colten property was worth only $270,000. The Wyatt's royalty interest was worthless.

(11) Plaintiffs do not hold reasonable investment-backed expectations because the Sewanee coal seam is highly variable and unpredictable such that no one would have an expectation of profitably mining the coal on the property. Plaintiffs should have known that their mining would have adverse effects on the neighboring state park, and that plaintiffs' expectations should have been informed by SMCRA, which was enacted two years before plaintiffs obtained their interests.

(12) The character of governmental action weighs against finding a taking because OSM sought to prevent a nuisance. Plaintiffs' ac-

tivities threatened to cause substantial harm in the community.

## Discussion

### I. Failure to State a Claim Upon Which Relief Can Be Granted

#### A. Standing

■ Only the owner of property at the time of a taking is entitled to compensation. *United States v. Dow,* 357 U.S. 17, 20, 78 S.Ct. 1039, 1043, 2 L.Ed.2d 1109 (1958) (citation omitted). Plaintiff Bernos is the sole shareholder of plaintiff corporations, but he did not hold any personal interest in the leases at the time of the taking. The lease agreements were entered into between Cane Company and Eastern Minerals, and between Colten Company and Van Buren Minerals.

■ Bernos does not have standing via his position as president and sole shareholder of the companies. A shareholder does not have standing to assert a claim in his own name for a wrong to a corporation. *Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel,* 20 F.3d 1311, 1317 (4th Cir.1994) (citation omitted). As this court recently noted:

> Individuals undertake to establish separate legal entities for doing business to garner favorable consequences under federal and state tax and corporate law. The voluntary legal arrangements cannot be invoked for one purpose and disregarded for another. At least, no party has advocated a principled reason for doing so. Nor can the property transfers be deemed ministerial, matters of form, or otherwise irrelevant to a takings analysis.

*Preseault v. United States,* 27 Fed.Cl. 69, 88 n. 11 (1992). Plaintiff Bernos does not have standing.

■ The Wyatt children acquired an interest in the subject property in 1991, over a year after the alleged date of taking. As they did not own an interest on the date of taking, the Wyatt children do not have standing to sue here.

#### B. Ripeness

##### 1. Eastern Minerals

■ Eastern's claim is based on five separate tracts of land, but it submitted a permit application for only one tract. According to defendant, this renders Eastern's claims as to the other four tracts unripe.

■ In cases involving a legislatively-established application process, the takings claim normally does not arise "until after a permit has been sought and denied and the effect of the denial results in economic detriment." *Conant v. United States,* 12 Cl.Ct. 689, 691–92 (1987). Plaintiffs are not required to exhaust such procedures if it would be futile to do so. *Id.* at 693.

■ The futility exception serves "to protect property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved." *Southern Pacific v. Los Angeles,* 922 F.2d 498, 504 (9th Cir.1990), *cert denied,* 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991). Additional filings in this case would have been wasteful until plaintiffs knew the Government's position on the first application. Plaintiffs were not required to file additional permit applications before the Government had decided the merits of the first application.

Other proposals would have been denied by OSM. Various federal and state offices were opposed to any mining on the subject properties, and OSM's broad reading of the "adverse effects" provision made it unlikely that Eastern would obtain a permit to mine any of the tracts.

Moreover, Eastern did not need permits for the other tracts. Most of the Sewanee coal on the property could have been reached from the single 33–acre surface mining operation covered by the one permit application. Eastern's claim is ripe for adjudication.

##### 2. Van Buren

■ The Government asserts that Van Buren's claim is not ripe for adjudication because it did not submit a separate permit application. Plaintiffs argue that submitting a separate application would have been futile

because Van Buren would have faced the same problems that Eastern encountered. According to plaintiff, mining the Van Buren coal *after* the Eastern tracts was the most profitable use of the land.

■ Although Van Buren *may* have faced the same delay Eastern endured, this is the sort of speculation that the ripeness doctrine seeks to avoid. *See Southern Pacific*, 922 F.2d at 504. Each plaintiff must satisfy the threshold requirement of a single meaningful application to maintain the futility exception. *Id.* We do not wish to read the meaningful proposal requirement so narrowly as to allow legal technicalities to undermine common-sense justice, but the Government was entitled to have meaningful notice of Van Buren's potential interest. Van Buren's claim is not ripe.

## II. Necessity of Final Agency Action

■ The Government argues that a takings claim cannot be evaluated until an agency has arrived at a final position regarding how the regulation at issue will apply. *See Williamson County Regional Planning Com'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 190–91, 105 S.Ct. 3108, 3118–19, 87 L.Ed.2d 126 (1985). Because plaintiffs identify two final agency actions but base their claim on neither, the Government argues that plaintiffs fail to state a claim. According to defendant, if plaintiffs did base their claim on either final agency action, the claim would be barred by the statute of limitations or by the principle that a plaintiff must own an interest in the property on the date of the taking.

Plaintiffs base their takings claim on a theory of extraordinary government delay that rendered their lease interests valueless. The Government recognizes that courts have found delay to be a basis for temporary takings, but never for a permanent taking. That no court has found a fact situation that supports such a theory does not necessarily mean that the concept does not exist. Were defendant's theory to prevail, the Government could withhold action on a permit indef-

initely and avoid liability for a taking. The Government would have no incentive to consider a permit application in a timely manner.

■ Plaintiffs' 1984 permit application was not denied until 1994. According to plaintiffs, government delay became extraordinary in 1990. Extraordinary delay in the permit review process can result in a permanent taking without the necessity of final agency action. The delay becomes extraordinary at some point and results in a constructive permit denial that supplants final agency action. Plaintiffs have stated a claim upon which relief can be granted.[3]

## III. Regulatory Takings Merits Analysis

■ The Federal Circuit has adopted a two-tiered approach to analyzing takings claims. *See M & J Coal Co. v. United States*, 47 F.3d 1148, 1153–54, *cert. denied*, —— U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995). First, we must determine whether the proscribed activity is a "stick" in plaintiffs' bundle of property rights. *Id.* at 1154 (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 2899, 120 L.Ed.2d 798 (1992)). If so, we consider whether the Government has interfered with the right such that it must pay compensation. *Id.* Considerations relevant to the second tier include the economic impact of the regulation, whether the regulation interfered with distinct investment-backed expectations, and the character of the governmental action. *Id.* (citing *Penn Central Transportation Co. v. New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)).

### A. Property Rights

■ Property rights are determined by state and common law. *Store Safe Redlands Associates v. United States*, 35 Fed.Cl. 726, 733 (1996) (citing *Lucas*, 505 U.S. at 1030, 112 S.Ct. at 2901).

---

**3.** Plaintiffs base their claim on extraordinary delay beginning in 1990 rather than the 1986 permit denial, so we need not address the Govern-

ment's statute of limitations argument. If the taking occurred in 1990, the claim is not barred by the statute of limitations.

 The Cane and Colten leases executed in 1979 gave Eastern the right to remove "all coal and other minerals included in the Landlord's Estates, whether or not now known to exist...." According to Tennessee law, a lease conveying mineral rights provides the lessee with a real property interest in the minerals. *See Bates v. Georgia Fertilizer Co.,* 144 Tenn. 32, 229 S.W. 153, 157 (1921); *Stanton v. Herbert & Sons,* 141 Tenn. 440, 211 S.W. 353 (1919).

 Tennessee recognizes that a royalty interest is "classified as realty." *J.M. Huber Corp. v. Square Enterprises Inc.,* 645 S.W.2d 410, 413 (Tenn.Ct.App.1982). The right to receive a royalty constitutes a real property interest in the mineral estate. *Id.* Under Tennessee law, both Eastern Minerals and the Wyatts owned property interests.

Citing *Lucas,* the Government argues that plaintiffs must first establish that they had a compensable expectancy to be free of the regulatory requirements imposed on mining in order to establish a regulatory taking. According to defendant, SMCRA and long-standing Federal and State regulations preclude the possibility that the property interests could have entailed the right to be free of regulatory control. This theory was rejected in *Store Safe.*

Plaintiffs argue that neither SMCRA nor the pre-existing State/Federal regulatory atmosphere had any impact on their property interests. We agree. Mere awareness that Eastern's permits could be affected by future regulations does not destroy plaintiffs' property interests. Plaintiffs who choose to do business in a heavily regulated industry do not forfeit all property interests.

The reasonableness of plaintiffs' investment backed expectations relates to whether government regulation effected a taking of their property interest rather than whether plaintiffs owned a compensable property interest. *Store Safe Redlands,* 35 Fed.Cl. 726, 734.

## B. Government Interference

### 1. Economic Impact

 Plaintiffs argue that as a result of the Government's extraordinary delay, their lease interests were rendered valueless. Defendant contends that it is not responsible for plaintiffs' voluntary relinquishment of their leases. Plaintiffs could not be expected to have renewed the leases if they were reasonably certain that necessary permits would not be granted. Extraordinary government delay may result in a constructive permit denial. Otherwise, the Government could delay action on a permit indefinitely and the property owner would have no recourse. Plaintiffs satisfy the economic impact prong where a delay is truly extraordinary.

Eastern resubmitted its permit application to OSM in October 1984. In December, OSM informed Bernos that Eastern's permit application was deficient. In March 1985, OSM told Eastern that its application was administratively complete, but that a permit would not be issued if the mining operation would adversely affect the park.

OSM sent Eastern a technical deficiency letter in May 1985. Eastern responded on June 25. An OSM official anticipated that a permit would be issued by November 1, and he requested a compliance review.

In December 1985, OSM asked for additional technical information. Rather than responding formally, Eastern applied to OSM for funds under the Small Operator Assistance Program.[4] Under that program, OSM conducts necessary drilling and testing for small operators.

Several Tennessee agencies and one Federal agency expressed concerns regarding plaintiffs' proposed operations. An employee's note to the file referenced state opposition and lack of additional technical information necessary to grant the permit. OSM denied Eastern's permit on July 2, 1986. Eastern appealed on July 30. An administrative law judge heard the appeal in June 1987, and directed OSM to inform Eastern of any additional information it needed to de-

---

**4.** The Government argued that plaintiffs were not eligible for SOAP funds because they planned to mine more than the maximum allowed. If plaintiffs had mined more than the maximum amount, the only sanction would have been reimbursement of the SOAP funds.

cide the permit application. In February 1988, OSM issued a technical deficiency letter. Plaintiffs reapplied for SOAP funds.

In 1988 and 1989, OSM suspended plaintiffs' application for SOAP funds several times. By late 1989, OSM lifted the suspension and began developing the SOAP project. SOAP engaged a consulting group to conduct tests and prepare a report for OSM.

The consulting group issued a preliminary report in December 1989. OSM rejected the report because it believed that the report was flawed. OSM spent the next several years attempting to develop specifications for a project that would produce the hydrologic and geologic information needed for Eastern's permit application.

In October 1990, two months after plaintiffs' right to extend the leases expired, OSM determined that it was necessary to conduct a fracture analysis on plaintiffs' property, and it received a bid for the work. A final report on the fracture analysis was submitted to OSM in February 1992, but OSM did not accept the results of this test. A year and a half later, OSM sent Eastern a third technical deficiency letter.

In 1991, the parties filed a joint request with the Administrative Law Judge for a consent decision. The motion noted that "the permit denial of July 2, 1986 has been effectively withdrawn ... all that remains is OSM's review of EMC Permit Application...." The administrative law judge issued a consent decision incorporating the motion. At the time, OSM was still reviewing the Eastern application that it received in 1984.

Plaintiffs' right to extend the leases expired on August 31, 1990. Plaintiffs did not extend the lease because they did not want to incur rent liability; it seemed to them that OSM would never grant the permit. After their right to extend the lease expired, Bernos and Eastern continued to pursue the permit application in hopes that they could negotiate a new lease with Cane. In April 1994, OSM denied Eastern's permit because

it had not provided the information requested in the third technical deficiency letter.

■ The Government delayed consideration of plaintiffs' permit application for an extraordinary length of time. Plaintiffs relinquished their lease interests because they believed the permits would never be granted and could not afford to incur rent liability in the mere hope that the Government would act. We determined at trial that the Government had no intention of ever granting the permit. The fact that the leases were relinquished voluntarily may affect our calculation of just compensation, but it does not deprive plaintiffs of the necessary showing of economic impact.

**2. Investment–Backed Expectations**

■ Plaintiffs must show that they took an interest in the property "in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies,* 28 F.3d at 1177. One who obtains an interest in property with knowledge of a restraint does not have a reliance interest and has assumed the risk of economic loss. *Id.*

Plaintiffs obtained the leases in 1979, two years after SMCRA was enacted. They obtained two permits during the interim phase of SMCRA in 1980 and 1981.[5] The Government argues that the provision that prohibits any adverse effects on public parks did not apply when those permits were issued, but that plaintiffs should have known that the provision eventually would be enforced. Thus, they are deprived of investment-backed expectations.

The adverse effects provision was enforced during the interim phase of SMCRA. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). In *Hodel,* the Court noted that provisions of SMCRA, including the adverse effects provision, are effective during the interim period on their own terms. *Id.* at 269 & n. 2, 101 S.Ct. at 2356 & n. 2.

---

**5.** SMCRA was implemented in an interim and a permanent phase. The interim program mandated enforcement of only some of the Act's provisions whereas during the permanent phase, a regulatory program mandating compliance with all of the federal standards was adopted for each state.

Tennessee's 1982 conditionally approved permanent regulatory program expanded the definition of adverse effect. Plaintiffs' permit was denied in 1986 after the Office of Surface Mining assumed direct federal enforcement of Tennessee's program. Plaintiffs leased the property in reliance on a state of affairs that did not include the definition of adverse effect that formed the basis of the permit denial. Plaintiffs reasonably relied on the two permits they received under SMCRA when they invested in the property.

Defendant argues that the Sewanee coal seam is so highly variable and unpredictable that plaintiffs' expectation of profit was unreasonable. At the same time, it emphasizes that Wyatt sold the Cane property for more than $5 million and that Bernos sold his mineral interest in the Colten property for $2.5 million. We assume that these market prices accurately reflect value. Evidence at trial showed that plaintiffs were not unreasonable in expecting that the subject land contained coal and that coal exploration would be profitable. Plaintiffs' investment in the box cut and other activities with the expectation of gaining profit was reasonable.

### 3. Character of Governmental Action

 This prong of the regulatory takings analysis addresses the degree and result of a regulation. Plaintiffs must show that "the government action went beyond the type of government land-use regulation that is a cost all citizens must pay for living in organized society." *Bowles v. United States,* 23 Cl.Ct. 443, 446–47 (1991) (citing *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 415–16, 43 S.Ct. 158, 159, 160, 67 L.Ed. 322 (1922)). This inquiry:

> examines the challenged restraint under the lens of state nuisance law. If the regulation prevents what would or legally could have been a nuisance, then no taking occurred. The state merely acted to protect the public under its inherent police powers.

*Creppel v. United States,* 41 F.3d 627, 631 (Fed.Cir.1994).

 To show that plaintiffs' planned activities are prohibited under the state's common law nuisance doctrine, the Government must "identify background principles of nuisance and property law that prohibit the uses [the landowner] now intends in the circumstances in which the property is presently found." *Lucas,* 505 U.S. at 1031, 112 S.Ct. at 2901.

 A per se nuisance is one in which the injury is certain rather than speculative. *State v. Feezell,* 218 Tenn. 17, 400 S.W.2d 716, 719 (1966). "[W]here injury from a nuisance is not real and immediate and certain to occur, but only uncertain or contingent, the nuisance will not be enjoined anticipatory to its going into operation." *Id.* Coal mining is not a per se nuisance, and the Government did not show that injury to property from plaintiffs' activities was certain.

 Coal has been mined on the Wyatt's property since at least 1954. "The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law prohibition." *Lucas,* 505 U.S. at 1031, 112 S.Ct. at 2901.

Coal mining may constitute a nuisance in certain circumstances, but the Government presented no convincing evidence that plaintiffs' proposed activities would constitute a nuisance. Defendant argues that OSM prevented the proposed mining operation from causing "nuisance-like" impacts upon a nearby state park from water pollution and noise. According to defendant, plaintiffs' mining operation threatened to cause substantial harm in the community and to endanger public health and safety. It cites various statutes that identify pollution and noise as nuisances under Tennessee law. In fact, neither the noise nor the hydrology concerns that OSM raised constituted a nuisance.

Tennessee granted permits to mine in 1980 and 1981. The State was not concerned with potential nuisance problems. Plaintiffs' 1984 permit was denied on the basis of "adverse effects." These adverse effects never were proven and cannot form the basis for a nuisance exception to takings law.

### Conclusion

The claims of plaintiffs Bernos, Van Buren Minerals, Mary Anne Wyatt, Nancy Wyatt Zorn, and Wilson W. Wyatt, Jr., are dis-

missed for the reasons stated. The property interests of plaintiffs Eastern Minerals International, Wilson W. Wyatt, Sr., and Anne D. Wyatt were rendered valueless through extraordinary delay by the United States in acting on their permit requests. The parties will agree on an appropriate valuation for the property taken and notify the court no later than November 1. We are available at any time to assist counsel in determining damages if necessary.