**BELUGA MINING COMPANY,**
**Appellant,**

v.

**STATE of Alaska, DEPARTMENT**
**OF NATURAL RESOURCES,**
**Appellee.**

No. S–8256.

Supreme Court of Alaska.

Feb. 19, 1999.

---

Peter J. Maassen, Ingaldson Maassen, P.C., Anchorage, for Appellant.

Nathaniel B. Atwood, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, and COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Beluga Mining Company held mining claims located on lands held in trust by the State for the benefit of the Alaska Mental Health Lands Trust. A preliminary injunction entered in litigation over the State's handling of the Mental Health Trust lands prevented the State from issuing mining leases on trust lands. Unable to mine its claims, Beluga abandoned them and sued the State for resulting economic losses. The superior court dismissed the suit. Because we conclude that there was no taking, contract, or unjust enrichment, we affirm.

## II. FACTS AND PROCEEDINGS

Beluga Mining Company, a corporation created to begin a gold mining operation, owned mining claims known as the "Beluga–Threemile Claims" on more than 36,000 acres on the west side of Cook Inlet. Beluga's predecessors staked the claims before 1983. Some were located on lands held in trust by the State for the benefit of the Alaska Mental Health Lands Trust.

Beluga worked on developing its claims. In 1989 the State granted the first of Beluga's annual placer mining applications. In 1990 the State issued Beluga a miscellaneous land use permit. Beluga conducted assay work which it estimated cost hundreds of thousands of dollars. In 1990 and 1991 Beluga had a processing plant designed, con-structed, and shipped to Alaska. In February 1991 Beluga created Nuway Corporation to conduct actual mining activities. By the spring of 1991, Beluga was allegedly ready to begin operations and only needed to obtain a state mining license.

Beluga was prevented from obtaining a mining license by the Mental Health Lands Trust litigation, described in State v. Weiss (Weiss I), 706 P.2d 681 (Alaska 1985). The litigation arose out of the State's breach of a trust imposed by the federal government before Alaska became a state.[1] In the 1956 Alaska Mental Health Enabling Act (AMHEA), Congress granted one million acres of federal land to the Territory of Alaska to "be administered by the Territory of Alaska as a public trust"; the trust income was to "first be applied to meet the necessary expenses of the mental health program of Alaska."[2] Notwithstanding the land's trust status, "[t]he state managed these lands without maintaining a special account until 1978," when the Alaska legislature enacted legislation that redesignated the AMHEA land as general grant land, to be managed by the Alaska Department of Natural Resources.[3]

A class of mental health program beneficiaries sued the State in 1982, seeking to overturn the 1978 redesignation legislation and to have the original AMHEA trust land restored to trust status.[4] In 1985 we held that the State had breached its duties as trustee; we invalidated the 1978 redesignation legislation and remanded the case for reconstitution of the trust "to match as nearly as possible the holdings which comprised the trust when the 1978 law became effective."[5] We also required that the trust be reimbursed at fair market value at the time of sale for trust lands that had been "sold."[6] We declined to rule on questions raised by the amicus regarding the title held by conveyancees and bona fide purchasers of trust

1. See State v. Weiss, 706 P.2d 681, 681–84 (Alaska 1985).

2. Id. at 681–82.

3. Id. at 682 (citing ch. 181, § 3(a), SLA 1978).

4. See id. at 682.

5. Id. at 684.

6. Id.

lands.[7] We later held that our decision invaliding the redesignation statute did not strip the title from a third-party bona fide purchaser of those lands.[8]

On remand, the *Weiss* plaintiffs asserted that parcels granted to Alaska under the AMHEA, including those encumbered by third-party interests, should be returned to trust status under the *Weiss I* decision. The State contended that those parcels had been "sold," and that the appropriate remedy was cash compensation, not return of those lands to trust status. Consistent with that position, the State planned to fulfill its perceived obligations to third-parties by issuing patents, leases, permits, etc., when the third-parties satisfied all conditions precedent.

In July 1990 the *Weiss* plaintiffs obtained a preliminary injunction that temporarily precluded the State from conveying to third-parties any interests (such as mining leases or production licenses) in original trust lands, pending resolution of the *Weiss* litigation. The preliminary injunction enjoined the State from

> issuing any patent(s) or other documents or taking any further steps which convey or transfer mental health trust lands or any interest(s) therein, including without limitation, any permits to use or occupy mental health trust lands, or extract resources from any mental health trust lands, pending final resolution of this litigation or earlier order of this court.

The State had opposed the preliminary injunction in part because it would frustrate the State's ability to satisfy the State's obligations to third-parties. Superior Court Judge Mary E. Greene, presiding over the *Weiss* litigation, responded to the State's concern, noting that,

> The state can be adequately protected. The preliminary injunction would not undo any of the state's commitments; rather, it would delay execution. The effect of the preliminary injunction would be to temporarily prevent the state from transferring

title to the mental health trust lands to third-parties pending resolution of the claims in this lawsuit.

Judge Greene also entered an order addressing third-party interests adversely affected by the injunction. The order stated that a third-party claiming an interest in mental health trust lands could move to modify the July injunction, and that the court would not act on any such motion until the third-party certified that it had first sought relief by stipulation through consultation with the *Weiss* plaintiffs and the State.

Because the Beluga–Threemile Claims were located on original trust lands, the preliminary injunction frustrated Beluga's efforts to mine its claims.

Nuway filed an Annual Placer Mining Application, Land Use and Water Use Permits, and Mining License for Threemile Claim No. 264 in early 1991. The Department of Natural Resources (DNR) determined that the application was consistent with the Alaska Coastal Management Program, but that Beluga would also need a state mining lease. Michael Bolstridge, the president of Beluga and Nuway, sought to convert four of the Beluga–Threemile Claims into an upland mining lease. According to Beluga, DNR informed Bolstridge in 1991 that the commissioner could not approve Beluga's lease application without the approval of James Gottstein, a private attorney who represented one of the plaintiff classes in *Weiss*. Beluga claims on appeal that Gottstein required commercially unreasonable terms.

Beluga asserts that because it was unable to obtain Gottstein's approval, Beluga did not obtain a mining lease and could not mine the Beluga–Threemile Claims. Beluga did not file a motion to modify the *Weiss* preliminary injunction, as permitted by Judge Greene's order addressing third-party participation. Beluga claims that it tried to remain viable until it could mine its claims under commercially reasonable terms. It asserts that its

7. *See id.* at 684 n. 4.

8. *See James v. McCombs,* 936 P.2d 520, 525–26 (Alaska 1997). *See also Alaska Center for the Envir. v. State,* 940 P.2d 916 (Alaska 1997) (reviewing history of *Weiss* litigation); *Weiss v. State*

*(Weiss II),* 939 P.2d 380 (Alaska 1997) (affirming superior court's approval of agreement settling *Weiss* litigation and reviewing history of *Weiss* litigation).

principals exhausted their cash reserves, sold personal assets, and sold twenty percent of Beluga's stock to pay the annual rental on the claims. Beluga finally abandoned the claims in November 1994 after failing to make the necessary rental payments.

On December 6, 1994, Judge Greene approved a settlement in *Weiss*, dismissed that case, and dissolved the preliminary injunction.

Beluga sued the State in 1996. Its amended complaint asserted contract, quasi-contract, rescission, promissory estoppel, breach of the covenant of good faith and fair dealing, and takings claims. Superior Court Judge John Reese granted the State's motion to dismiss. Beluga sought reconsideration on the ground that the superior court had not addressed the takings issue. Judge Reese denied the reconsideration motion.

Beluga appeals.

## III. DISCUSSION

### A. Standard of Review

■ Both sides asked the superior court to consider materials outside the complaint when the State moved for dismissal under Alaska Civil Rules 12(b)(6) and 56. The court granted the motion without specifying what materials it had considered. As the parties have requested, we choose here to review the order as a grant of summary judgment.[9] In doing so, we must determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law.[10] We are not bound by the reasoning of the superior court and can affirm a grant of summary judgment on alternative grounds.[11] Moreover, we should consider any matter appearing in the record, even if not passed upon by the lower court, in defense of the judgment.[12]

### B. There Was No "Taking."

Beluga argues that it obtained exclusive rights to mine the Beluga–Threemile Claims by locating them, and that the State "took" those rights, depriving Beluga of private property without just compensation in violation of the Alaska Constitution.[13]

A person obtains the exclusive right to possess and extract minerals on state land open to claim staking by discovery, location, and recording.[14] But AS 38.05.275 states that, "[m]ining locations made on state land ... acquire for the locator mining rights under AS 38.05.185–38.05.275, *subject to existing claims* and to any denial of or restriction in the tentative approval of state selection or patent of the land to the state." (Emphasis added.)

■ The mining statutes defined Beluga's rights as the successor locator of the Beluga–Threemile Claims. Given the "existing claims" limitation in AS 38.05.275, Beluga's

---

9. *See Andrews v. Wade & De Young, Inc.*, 875 P.2d 89, 90–91 (Alaska 1994) (recognizing our three options in such an event: remanding for proper consideration, reviewing the decision as a grant of relief under Rule 12(b)(6) after exclusion of the outside materials, or reviewing it as a grant of summary judgment).

10. *See id.* at 91 n. 5 (citing *Drake v. Hosley*, 713 P.2d 1203, 1205 (Alaska 1986)).

11. *See Wright v. State*, 824 P.2d 718, 720 (Alaska 1992) (citing *Moore v. State*, 553 P.2d 8, 21 (Alaska 1976)).

12. *See id.* (citing *State v. Pete*, 420 P.2d 338, 341 (Alaska 1966); *Ransom v. Haner*, 362 P.2d 282, 285 (Alaska 1961)).

13. "Private property shall not be taken or damaged for public use without just compensation." Alaska Const. art. I, § 18.

14. *See* Alaska Const. art. VIII, § 11 ("Prior discovery, location, and filing, as prescribed by law, shall establish a prior right to these minerals and also a prior right to permits, leases, and transferable licenses for their extraction."); AS 38.05.195 ("Rights to deposits of minerals subject to AS 38.05.185–38.05.275 in or on state land that is open to claim staking may be acquired by discovery, location and recording as prescribed in AS 38.05.185 –38.05.275. The locator has the exclusive right of possession and extraction of the minerals subject to AS 38.05.185–38.05.275 lying within the boundaries of the claim."); *Welcome v. Jennings*, 780 P.2d 1039, 1042 (Alaska 1989) (noting that "[a] person acquires the exclusive right to possess and extract minerals on state land by discovery, location and recording").

rights could be clouded by assertion of an "existing claim." The superior court held that "the *Weiss* litigation constituted an 'existing claim' under [AS 38.05.275]. Any rights [Beluga] could have obtained to its claims would have been subject to the rights of the Mental Health Trust."

Beluga asserts that the *Weiss* plaintiffs had no "existing claims" under AS 38.05.275 to the Beluga–Threemile Claims, because the *Weiss* litigation first made claims adverse to Beluga's mineral rights when Judge Greene entered the 1990 injunction, long after Beluga's claims had been located.

We do not agree. The crux of Beluga's suit is that the State prevented Beluga from exercising its "right" to mine. Because no "right" to mine could arise until the State issued Beluga the necessary mining leases, and because the 1990 *Weiss* injunction prevented the State from issuing those leases, the *Weiss* plaintiffs had clearly asserted "existing claims" within the meaning of AS 38.05.275. As the State points out, it did not matter whether the *Weiss* plaintiffs asserted claims that were actually superior to Beluga's; what mattered was that they asserted that their as-yet-unresolved claims were superior to claims such as Beluga's and that the injunction preserved the status quo while those claims were litigated.

Beluga next asserts that the State's acts effected a "taking" under takings doctrine as applied in Alaska.

Before we turn to Beluga's legal arguments, we note that it is not apparent how the State "took" Beluga's property. Takings doctrine is only implicated when the State deprives a person of a property right. The State deprived Beluga of no property right. Beluga had property rights in its claims, but it had no right to mine; its mining "rights" were prospective and contingent, and were subject to existing claims. These considerations appear to present an insurmountable threshold to Beluga's takings claim, but even

if they did not, Beluga's legal arguments are unconvincing.

■ Beluga first argues that a per se taking occurred. We have recognized two classes of per se takings: (1) where there is a physical invasion and (2) where a regulation denies a landowner all economically feasible use of the property.[15] We do not perceive any per se taking. There was no physical invasion of Beluga's property, and no "regulation" denied Beluga all economically feasible use of its property. The injunction simply delayed Beluga's ability to obtain permission to mine and did not deprive Beluga of its underlying claims. Beluga's failure to make the annual rental payments—not the State's enforcement of the statutory scheme—caused the loss of Beluga's claims.

■ We have also stated that when cases are not within either per se category, "courts must engage in a case-specific inquiry to determine whether governmental action effects a taking."[16] This inquiry triggers a four-factor analysis. Courts should consider "(1) the character of the governmental action; (2) its economic impact; and (3) its interference with reasonable investment-backed expectations. The legitimacy of the interest advanced by the regulation or land-use decision is also relevant to this inquiry."[17]

■ Invoking these factors, Beluga next argues that it suffered a taking because (1) the State's mismanagement of the Mental Health Lands Trust led to the *Weiss* injunction; (2) Beluga suffered a major economic loss; (3) Beluga's investment-backed expectations were reasonable; and (4) any interest advanced by the "regulation" (the "Gottstein approval requirement") was not legitimate because it was the direct result of the State's misconduct that led to the *Weiss* litigation.

Beluga's discussion of the takings issue does not explain how the case-specific factors apply to these circumstances. It does not clearly explain which State entity (legisla-

**15.** *See Anchorage v. Sandberg,* 861 P.2d 554, 557 (Alaska 1993) (citing *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1014–19, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)).

**16.** *Id.* (citing *Lucas,* 505 U.S. at 1019 n. 8, 112 S.Ct. 2886).

**17.** *Cannone v. Noey,* 867 P.2d 797, 800 (Alaska 1994) (quoting *Sandberg,* 861 P.2d at 557).

ture, superior court, or DNR) or act (enactment of the redesignation legislation, entry of the injunction, or denial of the lease application) effected the alleged taking. We are left with a conclusory assertion that the facts satisfy the factors, but with little analytical guidance. The following brief discussion explains why we conclude that Beluga has not demonstrated that a taking occurred under the four-factor inquiry.

Both the character of the State's acts and the legitimacy of its interest weigh against finding a taking. The State did not physically interfere with, damage, or destroy Beluga's property. The redesignation legislation was ill-fated, but was not intended to adversely affect Beluga or others like it. The injunction, although intended to affect claimants such as Beluga, was a necessary and appropriate act of judicial discretion intended to maintain the status quo and protect adverse claimants who potentially possessed unresolved existing claims superior to Beluga's. And the superior court also entered an order appropriately allowing third persons, such as Beluga, to seek interim relief.

The economic impact of the State's actions is difficult to assess, partly because Beluga's losses appear attributable to Beluga, not the State. Beluga did not ask the superior court to lift the injunction or relax the requirements for relief from the injunction. Also, we put little weight on any economic impact of the injunction and lease denial, because they delayed but did not terminate the permitting process. Beluga lost its claims, and the opportunity to obtain permission to mine, when it failed to pay the annual rentals, not because DNR or the court appropriated Beluga's property. Beluga claims that it was unable to pay the rentals because its resources were exhausted, but that exhaustion is not attributable to the State.

Although Beluga asserts it invested heavily in its claims, it has not established a basis for concluding that it had "reasonable investment-backed expectations." Beluga's claims

were always contingent on State permission to mine and assertion of adverse existing claims. Absent any demonstration to the contrary, we conclude that reasonable investors could have recognized that DNR might be delayed in granting Beluga permission to mine. After all, Beluga developed its claims despite the pending *Weiss* litigation, which began in 1982, despite our 1985 decision that invalidated the 1978 redesignation legislation and left open the question of whether the claims of parties like Beluga were superior to the claims of the *Weiss* plaintiffs, and despite AS 38.05.275, which made Beluga's rights subject to existing claims. In our view, Beluga has not demonstrated a basis for finding that governmental action had the character of a taking or the kind of economic impact on investment-backed expectations that would permit a conclusion that a taking had occurred.

Beluga cites *Conoco, Inc. v. United States,* 35 Fed.Cl. 309 (1996), to support its takings argument. Conoco and other companies (lessees) had federal off-shore oil leases which granted the lessees exclusive rights to drill for, develop, and produce oil and gas resources, subject to the Outer Continental Shelf Leasing Act (OCSLA) and other applicable law.[18] But before the lessees could produce oil, they had to submit an environmental impact statement and exploration and development plans for approval by the Secretary of the Interior.[19] Congress later enacted the Outer Banks Protection Act, which restricted the Secretary's powers to approve the lessees' proposed plans.[20] The lessees sued for breach of contract and taking. The Federal Claims Court stated that the new laws prevented the plaintiffs from taking part in the regulatory process because the Secretary would not even consider the exploration plans.[21] The court concluded that there was a breach of contract, and declined to preclude a takings claim based on the breach.[22]

**18.** *See Conoco, Inc. v. United States,* 35 Fed.Cl. 309, 317 (1996).

**19.** *See id.*

**20.** *See id.* at 318.

**21.** *See id.* at 327.

**22.** *See id.* at 327, 336.

Beluga contends that *Conoco* is analogous: Just as the statutory scheme obliged the Secretary to consider Conoco's lease application under the statutory scheme, the State of Alaska was obliged to consider Beluga's mining lease application. Beluga argues that the State breached this obligation by requiring that Beluga obtain Gottstein's approval; Beluga alleges that this requirement imposed a new obstacle that did not exist under the normal statutory framework, and that its inability to surmount this new obstacle caused the loss of Beluga's claims.

But *Conoco* is distinguishable. The lease contracts between the *Conoco* lessees and the Office of Surface Mining (OSM) expressed the particular process to which the lessees were subject, and the deviation from that process constituted the breach of contract. Whereas the government action in *Conoco* altered an existing contract, Beluga had no contract with the State that altered the potential effect of AS 38.05.275. Any rights Beluga potentially had to extract minerals were always subject to challenges under the "existing claims" provision in AS 38.05.275. Because any delay the *Weiss* preliminary injunction caused was consistent with the provisions of law Beluga had to meet to obtain the right to mine, *Conoco* is inapposite.

Beluga also relies on *Eastern Minerals International, Inc. v. United States,* 36 Fed. Cl. 541, 545 (1996). Eastern, a coal lessee, had prepared a site for mining and then applied to the OSM for a mining lease.[23] OSM denied the lease on grounds of the possible adverse effects.[24] Eastern appealed the denial, and an administrative law judge ordered OSM to make specific findings regarding the probable adverse effects and reconsider the permit.[25] OSM delayed making the findings for several years.[26] Finally, Eastern allowed its contractual right to extend its lease to expire, since it "believed that OSM would never grant the permit" and it "did not want to incur additional rent liability." [27] The court determined at trial that "the Government had no intention of ever granting the permit." [28] The court held that a compensable taking had occurred.[29]

*Eastern Minerals* is also distinguishable. The State did not fail to do something, such as issuing findings or permits, that it was required to do. Rather, the preliminary injunction prevented the State from doing what Beluga wanted it to do. But Beluga had no absolute rights to extract minerals from the claims. Rather, its rights were always subject to existing claims, challenges, and possible delay under the statutory scheme. The *Weiss* injunction and the attendant "Gottstein approval requirement" were consistent with the provisions of law controlling issuance of approval to mine. The delay the preliminary injunction caused was well within the realm of challenges anticipated by the statutory scheme.[30] The injunction included a procedure for deciding whether the *Weiss* plaintiffs' claims were superior to Beluga's.

The superior court did not explain why it rejected the takings claim. Because we conclude that the claim lacked merit, any possible error in failing to address the claim was harmless.[31]

**23.** *See Eastern Minerals Int'l, Inc. v. United States,* 36 Fed.Cl. 541, 545 (1996).

**24.** *See id.*

**25.** *See id.*

**26.** *See id.* at 550.

**27.** *Id.* at 545.

**28.** *Id.* at 550.

**29.** *See id.* at 548–52.

**30.** *Cf. Aspen Exploration Corp. v. Sheffield,* 739 P.2d 150, 162 n. 27 (Alaska 1987) (noting in

footnote that when plaintiff's ability to obtain offshore prospecting rights was dependent on grant of permit and plaintiff's application for permit was by law subject to possible denial, plaintiff had no vested right in permit and could not complain of deprivation of any substantive property right when permit was denied); *cf. also Owens v. Beard,* 829 F.Supp. 736, 739 (M.D.Pa. 1993) (stating that if decision-making process is discretionary, i.e., statutes and regulations establish guidelines without mandating a particular result, there is no protectable interest in achieving a particular outcome to support a due process claim).

**31.** *See Veal v. Newlin,* 367 P.2d 155, 157 n. 8 (Alaska 1961); *see also* Alaska R. Civ. P. 61.

### C. There Was No Breach of Contract.

■ Beluga contends that it had a claim for breach of contract because it was unable to mine the claims:

[The State's] interposition of this extra hurdle—Gottstein's approval—was not a part of the mining laws as embodied in the Constitution and AS 38.05.185–275, but was rather mandated by the *Weiss* injunction that had been put in place to help remedy the State's misfeasance in the handling of the AMHEA trust.

The interposition of this extra hurdle significantly altered the statutory requirements necessary to obtain a mining lease and in fact rendered impossible Beluga's exercise of its "exclusive right of possession and extraction of the minerals." The change of the rules ... was a breach of the State's promises to Beluga and gives rise to contract damages....

Citing *Clawson v. United States*, 24 Cl.Ct. 366, 370 (1991), the superior court held that Beluga's yearly payments to the State under statutory mining law did not create a contract, that there was no express or implied intent to enter into a contract, and that there was no consideration or bilateral exchange to support the finding of a contract. In *Clawson*, the Federal Court of Claims considered the way in which mining rights are acquired by statute and regulation, rather than by bilateral exchange, and concluded that "there is no contract in the usual sense of the word." [32] The *Clawson* court stated that " '[i]t would do violence to traditional contract theory, not to mention the operation of government, to hold that any statute requiring some action by a citizen to obtain a benefit or protect a right constituted an open offer to contract.' " [33]

■ We agree. Because the statute gave rise to no contract between Beluga and the State, and because miscellaneous land use

permits covering the claims were expressly subject to the statutory scheme, we affirm the superior court's holding that the State could not be liable on a claim for breach of contract. As the State points out, the formation of a valid contract requires "an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound." [34] No express or implied promise by the State could have created a contractual mining right, thereby eliminating the requirement of participation in the public process established by the Alaska mineral location regulatory scheme.

Beluga raises two additional arguments that assume a contract between the State and Beluga: (1) the State breached the covenant of good faith and fair dealing by failing to use diligent efforts to have the preliminary injunction lifted to permit Beluga to exercise its rights on the Beluga–Threemile Claims, and (2) the State cannot, in defending against a breach of contract claim, assert that the *Weiss* injunction excused the State's performance by making its performance "impracticable." Our analysis of Beluga's contract claim forecloses these arguments.

### D. Estoppel Created No "Irrevocable License."

■ Beluga argues that it had an "irrevocable license" to mine, the result of an alleged "executed contract created by estoppel," subject only to the express requirements of AS 38.05.185–.275.

We have stated that " '[t]he general elements of equitable estoppel are (1) assertion of a position by conduct or word, (2) reasonable reliance thereon, and (3) resulting prejudice. A fourth element, most often explicitly stated in promissory estoppel cases, is that the estoppel will be enforced only to the extent that justice so requires.' " [35]

---

**32.** *Clawson*, 24 Cl.Ct. at 370 (citing *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985)).

**33.** *Id.* (quoting *Last Chance Mining Co. v. United States*, 12 Cl.Ct. 551, 556 (1987), *aff'd*, 846 F.2d 77 (Fed.Cir.1988)).

**34.** *See Davis v. Dykman*, 938 P.2d 1002, 1006 (Alaska 1997).

**35.** *Mortvedt v. State Dep't of Natural Resources*, 858 P.2d 1140, 1142–43 (Alaska 1993) (citations omitted) (quoting *Municipality of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984)).

Invoking these elements, Beluga argues that (1) the State's "position" was asserted by Alaska's mining laws, which give a minerals locator who complies with statutory and regulatory procedures exclusive rights to extract the minerals; (2) Beluga reasonably relied on its exclusive right to possess and extract the minerals; (3) Beluga was seriously prejudiced by the interposition of the non-statutory condition to lease (i.e., the "Gottstein approval requirement"); and (4) the question of whether injustice may be avoided by enforcing a promise is a fact question and the superior court failed to make factual findings regarding this question.

Equitable estoppel could give Beluga no irrevocable license to mine because Beluga cannot satisfy the first essential element. Beluga's rights were never exclusive of existing claims. Alaska Statute 38.05.275 states that, "Mining locations made on state land ... acquire for the locator mining rights ... subject to existing claims."[36] Given the absence of this element, Beluga's estoppel claim fails, and we need not consider whether, as the State argues, other elements were also absent.

### E. *Beluga's Annual Rental Payments Did Not Unjustly Enrich the State.*

■■■ Beluga argues that the State was unjustly enriched when it accepted Beluga's rental payments for mineral rights that the State was "ultimately unable to convey." We first note that Beluga inaccurately describes the circumstances. Although the *Weiss* injunction prevented the State from granting the mining lease when Beluga first sought it, the State regained authority to grant mining leases when the injunction was dissolved.

Beluga, however, was unable to wait until the dissolution of the *Weiss* injunction.

■■■ A party seeking to recover for unjust enrichment must show:

(1) a benefit conferred upon the defendant by the plaintiff;

(2) appreciation by the defendant of such benefit; and

(3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof.[37]

The superior court rejected Beluga's unjust enrichment argument, apparently because Beluga's rental payments preserved its mineral rights. The court noted that AS 38.05.265 and 11 AAC 86.221(e) require locators to preserve their mineral rights by paying yearly fees upon risk of losing their claims under abandonment.[38]

We agree. Beluga received something of value in exchange for its rental payments: preservation of its rights in the mining claims. The rental payments gave Beluga no additional substantive rights to the property.

### F. *Other Issues*

Given our resolution of the takings, contract, and unjust enrichment issues, we need not consider whether the superior court erred by holding that sovereign immunity barred claims that were based on any purported misrepresentations made by the State.[39]

### IV. *CONCLUSION*

The issues here turn on the nature of Beluga's rights to possess and extract miner-

---

**36.** *See supra* Part III.B.

**37.** *State, CSED v. Wetherelt,* 931 P.2d 383, 390 n. 13 (Alaska 1997) (quoting *Darling v. Standard Alaska Prod.,* 818 P.2d 677, 680 (Alaska 1991)).

**38.** 11 AAC 86.221(e) provides in relevant part that "[i]f a locator fails to make a timely rental payment, the claim or leasehold location will be considered abandoned under AS 38.05.265."

Prior to its amendment in 1997, AS 38.05.265 provided in relevant part that,

Failure to properly record a certificate of location or a statement of annual labor, file with the director within the time prescribed a lease application, pay any required annual rental, pay any required production royalty, or keep location boundaries clearly marked as required by AS 38.05.185—38.05.275 and by regulations adopted under these sections constitutes abandonment of all rights acquired under the mining claim, leasehold location, lease, or site involved, and the claim, location, lease, or site is subject to relocation by others.

**39.** *See* AS 09.50.250(3).

als from these mining claims. It is undisputed that the State's management of the trust lands resulted in the *Weiss* preliminary injunction. Because the delay caused by the *Weiss* injunction was within the realm of the statutory scheme that defined Beluga's rights, the State was not liable for Beluga's losses resulting from entry of the injunction. AFFIRMED.